**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

AT&T COMMUNICATIONS OF
CALIFORNIA, INC.; TELEPORT
COMMUNICATIONS GROUP OF SAN
FRANCISCO; TELEPORT
COMMUNICATIONS GROUP OF LOS
ANGELES; TELEPORT
COMMUNICATIONS GROUP OF SAN
DIEGO,
          *Plaintiffs-Appellants,*

v.

PAC-WEST TELECOMM, INC.;
MICHAEL R. PEEVEY; GEOFFREY E.
BROWN; DIAN M. GRUENEICH; JOHN
BOHN; RACHELLE CHONG,
Commissioners of the California
Public Utility Commission in their
official capacity,
          *Defendants-Appellees.*

No. 08-17030

D.C. No.
3:06-cv-07271-JSW

OPINION

Appeal from the United States District Court
for the Northern District of California
Jeffrey S. White, District Judge, Presiding

Argued and Submitted
October 6, 2010—San Francisco, California

Filed June 21, 2011

8363

Before: Stephen Reinhardt and Marsha S. Berzon, Circuit Judges, and Louis H. Pollak, Senior District Judge.*

Opinion by Judge Berzon

---

*The Honorable Louis H. Pollak, Senior District Judge for the U.S. District Court for Eastern Pennsylvania, Philadelphia, sitting by designation.

COUNSEL

Randolph W. Deutsch, Max Fischer, and Mark E. Haddad of Sidley Austin LLP, Los Angeles, California, for plaintiffs-appellants AT&T Communications of California, Inc., Teleport Communications Group of San Francisco, Teleport Communications Group of Los Angeles, and Teleport Communications Group of San Diego.

Robert Allen Brundage of Bingham McCutchen LLP, San Francisco, California; Tamar Finn of Bingham McCutchen LLP, Washington, DC; and William Carroll Harrelson and James Michael Tobin of Tobin Law Group, LLC, Tiburon, California, for defendant-appellee Pac-West Telecomm, Inc.

Christopher Paul Witteman of the California Public Utilities Commission, San Francisco, California, for defendants-appellees Michael R. Peevey, Geoffrey E. Brown, Dian M. Grueneich, John Bohn, and Rachelle Chong, Commissioners

of the California Public Utility Commission in their official capacities.

Laurel Rodnon Bergold and Richard K. Welch of the Federal Communications Commission, Washington, DC, for the Federal Communications Commission as amicus curiae.

---

## OPINION

BERZON, Circuit Judge:

When a customer of telephone company *A* places a local call to a customer of telephone company *B*, the two companies cooperate to complete the call. Traditionally, the telephone company of the individual receiving the call (company *B*) would bill the originating phone company (company *A*) for completing, or "terminating," the call, on a per-minute basis. When the phone call went in the opposite direction—from a company *B* customer to a company *A* customer—the billing, too, would be reversed. Underlying this "reciprocal compensation" arrangement was the empirically-based assumption that, over time, the telephone traffic going in each direction would even out.

In the late 1990s, however, a technological development undermined that assumption: the explosive growth of dial-up internet access. Unlike calls exchanged between friends and family members, your internet service provider (ISP)[1] never calls you back; all the telephone traffic originates from your phone line and terminates at the ISP's. Following passage of the Telecommunications Act of 1996, telephone companies

---

[1]In light of the oppressive number of acronyms used herein, and for the reader's convenience, we have included a glossary of terms in an appendix at the end of this opinion. Please note, however, that the definitions provided are meant only to apply to the terms as they are used in this opinion, and that they may have alternate or additional meanings in other contexts.

were allowed for the first time to compete with each other for local telephone customers. Some of these companies—called "competitive local exchange carriers" (CLECs), as distinct from the state-regulated monopolies that prevailed before 1996, which are now known as the "incumbent local exchange carriers" (ILECs)—realized that, in light of the reciprocal compensation regime, on the one hand, and the massively unidirectional traffic flows to ISPs, on the other, they could make a great deal of easy money by putting the two together. And so many of them did, targeting as their customers ISPs providing dial-up internet access. Each time their ISP customers received a phone call, the CLECs would bill the originating phone company (which tended, at least at first, to be an ILEC) for having terminated its call. But because the ISPs rarely made any outgoing phone calls, the CLECs could receive a great deal of compensation without ever having to put the "reciprocal" in "reciprocal compensation."

In 2001, the Federal Communications Commission (FCC) addressed this game of regulatory arbitrage in the not-so-succinctly-named *In the Matter of Implementation of the Local Competition Provisions in the Telecommunications Act of 1996, Intercarrier Compensation for ISP-Bound Traffic*, 16 F.C.C.R. 9151 [hereinafter, "*ISP Remand Order*"], which imposed a new compensation regime for ISP-bound traffic. In this case, we are asked to decide the proper scope of this alternative compensation regime.

Plaintiff-appellant AT&T (which is a CLEC in California) maintains that the *ISP Remand Order* applies when the carrier originating the call and the carrier terminating the call are both CLECs. Defendants-appellees Pac-West (also a CLEC) and the California Public Utilities Commission (CPUC) [together, "Appellees"] contend that the *ISP Remand Order*'s compensation regime applies only to traffic between a CLEC and an ILEC. The CPUC agreed with Pac-West's limited reading of the reach of the compensation regime, finding it inapplicable to the ISP-bound traffic originating with AT&T

and terminated by Pac-West, and so it assessed against AT&T charges consistent with Pac-West's state-filed tariff. AT&T then sued Pac-West and the CPUC in federal district court, alleging that the *ISP Remand Order* preempted Appellees' attempts to assess AT&T charges for ISP-bound traffic based on state-filed tariffs. The district court granted summary judgment to Appellees, agreeing with their argument that the *ISP Remand Order* does not apply to CLEC-to-CLEC traffic.

We agree with AT&T, and with the analysis contained in an amicus brief filed upon our request by the FCC, that the *ISP Remand Order*'s compensation regime applies to ISP-bound traffic exchanged between two CLECs. We therefore reverse.

## REGULATORY BACKGROUND

Until passage of the Telecommunications Act of 1996 (TCA), Pub. L. No. 104-104, 110 Stat. 56 (codified, as amended, in scattered sections of 47 U.S.C.), local exchange carriers (LECs)—those carriers responsible for telephone traffic within geographically-delineated regions known as Local Access and Transport Areas (LATAs), as distinct from long-distance (or "interexchange") traffic—operated as government-regulated monopolies. *See Global NAPs Cal. v. Pub. Utils. Comm'n of Cal.*, 624 F.3d 1225, 1228-29 (9th Cir. 2010); *Pac. Bell Tel. Co. v. Cal. Pub. Utils. Comm'n*, 621 F.3d 836, 839-40 (9th Cir. 2010); *see also Verizon Commcn's, Inc. v. FCC*, 535 U.S. 467, 475-76 (2002); *AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 371 (1999). With the TCA Congress opened up the LEC market to new entrants, eliminating their protected monopoly status. *See Verizon Commc'ns*, 535 U.S. at 476; *Global NAPs Cal.*, 624 F.3d at 1228. Both AT&T and Pac-West took advantage of the new statute to compete with the two companies that had previously enjoyed monopoly LEC status in different parts of California, Verizon and Pacific-Bell (now SBC California). Thus, for purposes of the local telephone markets relevant to this case,

AT&T and Pac-West are CLECs, and Verizon and SBC California are ILECs.

The TCA imposed special obligations on ILECs to mitigate their dominant market position. *See* 47 U.S.C. § 251(c)(2). But it also imposed on *all* "carriers"[2] the duty "to interconnect directly or indirectly with the facilities and equipment of other telecommunications carriers." *Id.* § 251(a)(1). "Interconnection allows customers of one LEC to call the customers of another, with the calling party's LEC (the 'originating' carrier) transporting the call to the connection point, where the called party's LEC (the 'terminating' carrier) takes over and transports the call to its end point." *Global NAPs Cal.*, 624 F.3d at 1228 (quoting *Verizon Cal. v. Peevey*, 462 F.3d 1142, 1146 (9th Cir. 2006)).

Interconnection, however, is not costless. The TCA therefore obligates LECs "to establish reciprocal compensation arrangements for the transport and termination of telecommunications."[3] 47 U.S.C. § 251(b)(5); *see also Global NAPs Cal.*,

---

[2]With certain exceptions not relevant here, the TCA defines "carrier" as "any person engaged as a common carrier for hire, in interstate or foreign communication by wire or radio or in interstate or foreign radio transmission of energy." 47 U.S.C. § 153(11).

[3]Although all carriers have the duty to interconnect and the duty to establish reciprocal compensation arrangements, *only* ILECs have the statutory duty to *negotiate* an interconnection agreement in good faith, *see* 47 U.S.C. § 251(c)(1), and *only* ILECs can be required to arbitrate an interconnection agreement if good-faith negotiations do not result in an agreement, *see id.* § 252(b). So the TCA leaves something of an enforcement gap: CLECs have statutory duties to interconnect with other LECs and to provide reciprocal compensation, but there is no procedure specified for one CLEC to require another CLEC to enter into an interconnection agreement that would govern the terms of those duties. (It is possible—although the matter is not before us—that 47 U.S.C. § 208(a), which erects a mechanism for filing complaints with the FCC, could provide a means of enforcing the general TCA duty to interconnect and to establish reciprocal compensation arrangements. *See Western Radio Servs. Co. v. Qwest Corp.*, 530 F.3d 1186, 1205 (9th Cir. 2008); *see generally N. County Commc'ns Corp. v. Cal. Catalog & Tech.*, 594 F.3d 1149, 1158-61 (9th Cir. 2010).)

624 F.3d at 1228. "Under a reciprocal compensation arrangement, the originating LEC must compensate the terminating LEC for delivering its customer's call to the end point." *Peevey*, 462 F.3d at 1146; *see also* 47 C.F.R. § 51.701(e). Shortly after the passage of the TCA, the FCC clarified that "reciprocal compensation obligations . . . apply only to traffic that originates and terminates within a local area." *In the Matter of Implementation of the Local Competition Provisions in the Telecommunications Act of 1996, Interconnection Between Local Exchange Carriers and Commercial Mobile Radio Service Providers*, 11 F.C.C.R. 15499, 16013 ¶ 1034 (1996) [hereinafter, "*Local Competition Order*"].

Traditionally—that is, before the widespread adoption of dial-up internet connectivity—reciprocal compensation arrangements required the originating LEC to pay the terminating LEC for each minute of each call (i.e., each "minute of use," or "mou"). *See, e.g.*, *ISP Remand Order*, 16 F.C.C.R. at 9162 ¶ 19 (discussing "the traditional assumptions of per minute pricing"). The logic behind this system was that, over time, the number of calls going each way would be essentially the same, and no LEC would pay more than its fair share of the costs associated with terminating other LECs' traffic. *See id.* at 9162 ¶ 20, 9183 ¶ 69.

With the advent of dial-up internet access, however, this arrangement led to a classic example of regulatory arbitrage.[4]

---

[4]"Regulatory arbitrage" is a pejorative term referring to the practice of operating a business to take maximum advantage of the prevailing regulatory environment (as opposed to delivering the maximum amount of value to the business's customers), usually at the expense of consumers, competitors, or taxpayers, as the case may be. *See, e.g.*, *Global NAPs, Inc. v. Verizon New Eng., Inc.*, 454 F.3d 91, 95 (2d Cir. 2006); *ISP Remand Order*, 16 F.C.C.R. 9162 ¶ 21; *see generally* Rob Frieden, *Regulatory Arbitrage Strategies and & Tactics in Telecommunications*, 5 N.C. J.L. & TECH. 227 (2004).

In this context, the FCC explained, the prevailing intercarrier compensation regime encouraged the "inefficient entry of LECs intent on serving

Certain CLECs (including Pac-West) took advantage of the traditional reciprocal compensation scheme to target as its customers a species of company that received a high number of telephone calls but originated very few—namely, ISPs offering dial-up internet access. *See ISP Remand Order*, 16 F.C.C.R. at 9153 ¶ 2; 9161 ¶ 21; 9183-84 ¶¶ 69-70. Not only do ISPs rarely, if ever, make outgoing calls, but calls to ISPs are much longer than average telephone calls. *See id.* at 9153 ¶ 2; 9162 ¶ 19 & 21; 9183 ¶ 69. Thus, CLECs predominantly serving ISP customers could collect huge sums in "reciprocal" compensation without ever having actually to reciprocate.

In response to the widespread practice of doing just that, the FCC promulgated an order in 1999 addressing the problem of ISP-bound phone calls. *See In the Matter of Implementation of the Local Competition Provision in the Telecommunications Act of 1996, Intercarrier Compensation for ISP-Bound Traffic*, 14 F.C.C.R. 3689 (1999) [hereinafter, "*Declaratory Ruling*"]. Applying an "end-to-end" analysis, whereby the geographic location of the telecommunications transmission's beginning and end points are compared, the FCC took the position that phone calls to an ISP do not actually terminate at the ISP's computers, but instead continue on to the servers (typically located across state lines or even in foreign countries) hosting the particular websites visited by the ISP's customers. *See id.* at 3697 ¶ 12.

For present purposes, the *Declaratory Ruling*'s end-to-end

---

ISPs exclusively and not offering viable local telephone competition, as Congress had intended to facilitate with the [TCA]." *ISP Remand Order*, 16 F.C.C.R. at 9162 ¶ 21. Indeed, the reciprocal compensation regime permitted LECs to offer ISPs "below cost retail rates subsidized by intercarrier compensation," *id.* at 9182 ¶ 68, and, in some instances, even made it "possible for LECs serving ISPs to afford to pay [the ISPs] to use [the LECs'] services." *Id.* at 9162 ¶ 21. In short, the reciprocal compensation regime for ISP-bound traffic "disconnect[ed] costs from end-user market decisions. . . . [,] disort[ing] competition by subsidizing one type of service at the expense of others." *Id.* at 9155 ¶ 5.

analysis had two primary consequences. First, the FCC held that ISP-bound traffic is jurisdictionally interstate, *see id.* at 3701-02 ¶ 18; and second, the FCC concluded that because ISP-bound traffic was not "local," the statutory reciprocal compensation obligation did not apply to it. *See id.* at 3706 ¶ 26 n.87. There were no federal regulations or rulings governing intercarrier compensation for ISP-bound traffic at the time. The FCC filled the gap by directing that "parties should be bound by their existing interconnection agreements." *Id.* at 3690 ¶ 1. Recognizing that some LECs had not yet entered into interconnection agreements, the FCC specified that state public utility commissions could "determine in their arbitration proceedings at this point whether reciprocal compensation should be paid for [ISP-bound] traffic." *Id.* at 3704-05 ¶ 25.[5]

The *Declaratory Ruling* was subsequently challenged in a petition to the U.S. Circuit Court of Appeals for the District of Columbia, resulting in a decision vacating it as insufficiently legally justified and remanding to the FCC for further proceedings. *See Bell Atl. Tel. Cos. v. FCC*, 206 F.3d 1, 3 (D.C. Cir. 2000).

On remand, the FCC issued a new ruling reaching the same conclusion—that ISP-bound traffic is not subject to reciprocal compensation—but, in light of the D.C. Circuit's legal ruling, on new grounds. *See ISP Remand Order*, 16 F.C.C.R. at 9151. The FCC held that all local telecommunications traffic was subject to the § 251(b)(5) reciprocal compensation obligation unless it fell into one of the three exceptions contained in 47 U.S.C. § 251(g), for "exchange access, information access, and exchange services."[6] The FCC then ruled that "Congress,

---

[5]As discussed in note 3, *supra*, only ILECs can be required to arbitrate an interconnection agreement. The *Declaratory Ruling* does not directly consider the possibility that both the originating and terminating LEC could be CLECs, likely because, so soon after passage of the TCA, ILECs still dominated the marketplace.

[6]"On or after the date of enactment of the [TCA], each local exchange carrier . . . shall provide exchange access, information access, and

through section 251(g), expressly limited the reach of section 251(b)(5) to exclude ISP-bound traffic." 16 F.C.C.R. at 9154 ¶ 3; *see also id.* at 9168 ¶ 37 ("ISP-bound traffic falls within at least one of the three enumerated categories in subsection (g).").

In addition to setting forth a new legal basis for excluding ISP-bound traffic from the statutory reciprocal compensation obligation, the FCC acknowledged the degree to which ISP-related regulatory arbitrage had distorted the market for telecommunications services. Accordingly, and as an exercise of the FCC's power under 47 U.S.C. § 201(b),[7] the *ISP Remand Order* set forth "interim" rules for how LECs would be compensated for ISP-bound traffic. These interim rules, central to this appeal, had four components:

(1) *Rate caps.* Rather than implementing "a 'flash cut' to a new compensation regime that would upset the legitimate business expectations of carriers and their customers," the FCC imposed declining rate caps, starting at $.0015 per mou and stabilizing, 36 months after the *ISP Remand Order* issued, at $.0007 per mou. 16 F.C.C.R. at 9186-87 ¶¶ 77-78. The rate caps had several limitations. First, they had "no effect to the extent that states have ordered LECs to exchange

exchange services for such access to interexchange carriers and information service providers in accordance with the same equal access and non-discriminatory interconnection restrictions and obligations (including receipt of compensation) that apply to such carrier on the date immediately preceding the date of enactment of the [TCA] under any court order, consent decree, or regulation, order, or policy of the [FCC], until such restrictions and obligations are explicitly superseded by regulations prescribed by the [FCC] after such date of enactment." 47 U.S.C. § 251(g).

[7]"All charges, practices, classifications, and regulations for and in connection with such communication service, shall be just and reasonable, and any such charge, practice, classification, or regulation that is unjust or unreasonable is declared to be unlawful . . . . The Commission may prescribe such rules and regulations as may be necessary in the public interest to carry out the provisions of this chapter." 47 U.S.C. § 201(b).

ISP-bound traffic either at rates below the caps we adopt here or on a bill and keep basis[8] (or otherwise have not required payment of compensation for this traffic)." *Id.* at 9188 ¶ 80. Insofar as particular interconnection agreements provided for compensation at higher rates, those higher rates were to apply only until "carriers renegotiate expired or expiring interconnection agreements." *Id.* at 9189 ¶ 82; *see also id.* (stating that the new rate caps "d[id] not alter existing contractual obligations, except to the extent that parties are entitled to invoke contractual change-of-law provisions").

The FCC "d[id] not preempt any state commission decision regarding compensation for ISP-bound traffic for the period prior to the effective date of the interim regime we adopt here," but stated that "[b]ecause we now exercise our authority under section 201 to determine the appropriate intercarrier compensation for ISP-bound traffic . . . state commissions will no longer have authority to address this issue." *Id.* If the rate caps did not adequately compensate LECs for their expenses, the *ISP Remand Order* explained, the LECs should look to their own customers for additional compensation. *Id.* at 9189 ¶ 83. Finally, as it is difficult for some carriers to identify particular traffic as ISP-bound, the FCC adopted a rebuttable presumption that traffic between two carriers that exceeds a 3:1 ratio of terminating traffic to originating traffic is ISP-bound traffic subject to the new compensation regime. *Id.* at 9187-88 ¶ 79.

---

[8]"Bill and keep," the FCC explained:

> refers to an arrangement in which neither of two interconnecting networks charges the other for terminating traffic that originates on the other network. Instead, each network recovers from its own end-users the cost of both originating traffic that it delivers to the other network and terminating traffic that it receives from the other network.

*ISP Remand Order*, 16 F.C.C.R. at 9153 ¶ 2 n.6 (citations omitted); *see also* 47 C.F.R. § 51.713(a).

(2) *Growth cap*. Next, the *ISP Remand Order* imposed a "growth cap" on total ISP-bound minutes for which a LEC could receive reciprocal compensation. *Id.* at 9187 ¶ 78. In 2001, a LEC could receive compensation for ISP-bound minutes equal to 110% of what the LEC received (on an annualized basis) for the first quarter of 2001; in 2002, it could receive 110% of what it received in 2001; and in 2003 onwards, it could receive compensation for the same amount of ISP-bound traffic that it received in 2002. *Id.*

(3) *New markets rule*. Third, the FCC implemented the so-called "new markets" rule, which provided that "where carriers are not exchanging traffic pursuant to interconnection agreements prior to adoption of [the *ISP Remand Order*], . . . . carriers shall exchange ISP-bound traffic on a bill-and-keep basis." *Id.* at 9189 ¶ 81. Again, in a "bill and keep" compensation regime, each carrier bills its own customers for its costs and keeps those payments as its compensation, with no compensation exchanged between the originating and terminating LECs. *See id.* at 9153 ¶ 2 n.6.

(4) *Mirroring rule*. Last, the *ISP Remand Order* imposed a special rule on ILECs only: the "mirroring" rule. *Id.* at 9194 ¶ 89. The FCC thought that it would be "unwise as a policy matter, and patently unfair" to permit ILECs to benefit from the reduced rates the *ISP Remand Order* instituted for ISP-bound traffic (for which ILECs were, by and large, net payors) while simultaneously allowing ILECs to recover the higher rates applicable to other forms of traffic (for which ILECs were typically net payees). *Id.* Accordingly, it mandated that "[t]he rate caps for ISP-bound traffic that we adopt here apply, therefore, *only if* an incumbent LEC offers to exchange all traffic subject to section 251(b)(5) at the same rate." *Id.*

As the *ISP Remand Order* emphasized, this new compensation regime was to be an interim measure. On the same day the *ISP Remand Order* issued, the FCC published a notice of

proposed rulemaking, setting forth for consideration a wholesale revision of the intercarrier compensation regime. *See Developing a Unified Intercarrier Compensation Regime, CC Docket No. 01-92, Notice of Proposed Rulemaking*, 16 F.C.C.R. 9610 (2001).

Like its predecessor, the *ISP Remand Order* was challenged via a petition to the D.C. Circuit. Once more, that Circuit found the FCC's legal justification for the new rules lacking, rejecting the FCC's reliance on § 251(g). *See WorldCom, Inc. v. FCC*, 288 F.3d 429, 433 (D.C. Cir. 2002). But in light of the fact that "[m]any of the petitioners themselves favor bill-and-keep, and there is plainly a non-trivial likelihood that the Commission has authority to elect such a system," the D.C. Circuit refused to vacate the *ISP Remand Order*, choosing instead to remand the case to give the FCC the opportunity to provide an alternative legal justification for its interim rules. *Id.* at 434.

Thus, all four components of the *ISP Remand Order* remained in effect from the date of its issuance (April 27, 2001) until October 8, 2004, when the FCC granted in part a petition of a CLEC, Core Communications, to forebear from enforcing the *ISP Remand Order. See Petition of Core Communications, Inc. for Forbearance Under 47 U.S.C. § 160(c) From Application of the ISP Remand Order*, 19 F.C.C.R. 20179 (2004) [hereinafter, "*Core Order*"]. Specifically, the FCC granted the petition with regards to the growth caps and new markets rule.

With regard to the growth caps, the FCC found that they were no longer in the public interest, particularly in light of the growth of broadband internet access and the corresponding decline in usage of dial-up internet services. *See id.* at 20186 ¶ 20; *see also id.* at 20187-88 ¶ 24 & 20189 ¶ 26. The FCC explained that its decision to forebear from enforcing the new markets rule was due to a decrease in its concern over opportunities for arbitrage, primarily because of the wide-

spread replacement of dial-up internet access with faster broadband services. In light of that development, the FCC explained, enforcing the new markets rule no longer outweighed the public interest in a uniform compensation regime. *See id.* at 20186-87 ¶ 21; *see also id.* at 20187-88 ¶ 24 & 20189 ¶ 26. But the FCC declined to forebear from enforcing the rate caps and mirroring rule, finding that the petitioner had failed to justify their discontinuation. *See id.* 20186-88 ¶¶ 19-20, 23 & 25.

Core Communications then petitioned the D.C. Circuit, challenging the partial denial of its petition for forbearance, and an ILEC petitioned to challenge the FCC's partial grant of Core's petition. The D.C. Circuit upheld the *Core Order* in its entirety. *In re Core Commc'ns, Inc.*, 455 F.3d 267, 270 (D.C. Cir. 2006). The rate caps and mirroring rule remain in effect today, but the FCC has not re-implemented the growth cap or new markets rule.

Meanwhile, the FCC was dilatory in responding to the D.C. Circuit's 2002 remand in *WorldCom*. Therefore, on July 8, 2008, the D.C. Circuit granted a writ of mandamus, ordering the FCC to provide a valid legal justification for its interim ISP compensation regime "in the form of a final, appealable order" no later than November 5, 2008. *In re Core Commc'ns, Inc.*, 531 F.3d 849, 861-62 (D.C. Cir. 2008). The FCC responded with an order entitled *In the Matter of Implementation of the Local Competition Provisions in the Telecommunications Act of 1996, Developing a Unified Intercarrier Compensation Regime, Intercarrier Compensation for ISP—Bound Traffic*, 24 F.C.C.R. 6475 (2008) [hereinafter, "*ISP Mandate Order*"]. The *ISP Mandate Order* asserted yet another legal basis for its interim ISP compensation regime: the FCC's general rulemaking authority under 47 U.S.C. §§ 201(b) and 251(j).[9] *See id.* at 6478 ¶ 6. This time the D.C.

---

[9]*See* note 7, *supra*; *see also* 47 U.S.C. § 251(i) ("Savings provision. Nothing in this section shall be construed to limit or otherwise affect the Commission's authority under section 201.").

Circuit accepted the FCC's legal justification as reasonable, *see Core Commc'ns, Inc. v. FCC*, 592 F.3d 139, 143-44 (D.C. Cir. 2010), and rejected the argument that the interim rules were arbitrary and capricious, *see id.* at 145.

The net result of these lengthy set of proceedings, as relevant to this case, is as follows: The "new markets" rule, which required LECs not exchanging traffic pursuant to an interconnection agreement prior to the issuance of the *ISP Remand Order* on April 27, 2001 to compensate each other on a "bill and keep" basis, remained in effect until October 8, 2004, when the *Core Order* was issued. The "mirroring" rule and the rate caps (including its 3:1 rebuttable presumption regarding ISP-bound traffic) have remained in effect continuously since the *ISP Remand Order* was issued. From April 29, 2004 onwards, the intercarrier rate for ISP-bound traffic has been capped at $.0007/mou.

## FACTUAL AND PROCEDURAL HISTORY

Pac-West has been operating in California as a CLEC since 1996 and has had intrastate tariffs on file with the CPUC since December 1998. These tariffs, which have been amended several times since first filed, purport to set Pac-West's rates for, *inter alia*, terminating local traffic originating with another LEC; they apply only in the absence of an interconnection agreement.

AT&T and Pac-West do not have (and have never had) an interconnection agreement with each other. Therefore, at all times relevant to this appeal, they have been exchanging traffic indirectly, with the traffic routed primarily through one of California's two ILECs, Verizon and SBC California, with whom both AT&T and Pac-West have interconnection agreements. The ILECs thus served as conduits for traffic going between Pac-West and AT&T. Pac-West's agreements with the ILECs provided that neither party would bill the other for this "transit traffic," and that for all transit traffic Pac-West

terminated, Pac-West would bill the LEC originating the traffic. Nonetheless, and for reasons unknown to us, for a few years, Pac-West billed the ILECs rather than AT&T for transit traffic AT&T originated.

Starting in July 2001, SBC California refused to pay Pac-West for this transit traffic, and Verizon did the same beginning in September 2002. Pac-West then began billing AT&T for the traffic AT&T originated, but AT&T refused to pay. The parties had no direct discussions about the issue until late 2003, when Pac-West sent AT&T a "formal request for negotiation of an interconnection agreement between our companies as provided for in Sections 251(a)(1) and specifically 251(b)(5) of the [TCA]." AT&T responded in February 2004 by stating that it "has no interest in entering into such an agreement"; that, as a CLEC, it had no obligation to negotiate an interconnection agreement[10]; and that under the "new markets" rule, the two carriers should continue to exchange all of their traffic (including that which was ISP-bound) on a "bill and keep" basis. The parties had additional communications but could not reach an accord.

Pac-West filed a complaint with the CPUC on October 20, 2004, alleging that AT&T owed it more than $3.5 million in reciprocal compensation for the AT&T-originated traffic Pac-West had terminated since August 2001, billed at Pac-West's state tariff rates. For the sole purpose of deciding the legal issues, Pac-West stipulated that all AT&T-originated traffic it terminated was ISP-bound; once the legal issues were resolved, however, Pac-West reserved its right to demonstrate later that at least some of the traffic was not bound to ISPs.[11] Similarly, both parties stipulated to the amount of traffic at

---

[10]*Cf.* note 3, *supra*.

[11]The record evidence establishes that Pac-West terminated more than 115 times as much traffic from AT&T as AT&T terminated from Pac-West.

issue and the amount of compensation Pac-West would be due ($7.115 million) if its state-filed tariff applied.

The CPUC issued its order on June 29, 2006, holding that the "new markets" rule did not apply where, as here, two CLECs are exchanging traffic indirectly and without an interconnection agreement. *See Pac-West Telecomm v. AT&T Commc'ns of Cal.*, Dec. No. 06-06-055, 2006 WL 1910202, at *11 (Cal. Pub. Util. June 29, 2006). The CPUC ruled that the "new markets" rule cannot be applied absent a "mirroring" offer, because to do so would permit AT&T to receive compensation in situations in which it is a net payee, but avoid paying anything when, as in the AT&T—Pac-West relationship, AT&T is a net payor. Because the "mirroring" rule only applies to ILECs, which AT&T is not (in California), the CPUC held that AT&T could not benefit from the "new markets" rule. *See id.* at *10. Relying on a 2005 FCC order, *T-Mobile*,[12] the CPUC held that in the absence of governing federal law, Pac-West's state-filed tariff was the appropriate place to look for the applicable rate, and awarded Pac-West $7.115 million in compensation, but no interest. *See id.* at *13-17.

Thereafter, AT&T sought rehearing by the CPUC, arguing for the first time that the CPUC lacked jurisdiction to hear a dispute regarding interstate traffic outside of an arbitration proceeding pursuant to 47 U.S.C. § 252. *See Pacific Bell v. Pac-West Telecomm, Inc.*, 325 F.3d 1114, 1126-27 (9th Cir. 2003) (discussing the state public utilities commissions' powers under § 252 "to arbitrat[e], approv[e], and enforc[e] interconnection agreements"). The CPUC denied AT&T's rehearing request. *See Pac-West Telecomm v. AT&T Commc'ns of Cal.*, Dec. No. 07-03-016, 2007 WL 725667, at *1 (Cal. Pub. Util. Mar. 1, 2007).

---

[12]*In re Developing a Unified Intercarrier Compensation Regime; T-Mobile Petition for Declaratory Ruling Regarding Incumbent LEC Wireless Termination Tariffs, Declaratory Ruling and Report and Order*, 20 F.C.C.R. 4855 (2005) ["*T-Mobile*"].

In the meanwhile, AT&T filed this suit in the U.S. District Court for the Northern District of California,[13] requesting: (1) a declaration that the CPUC's order was preempted by the TCA; (2) an order enjoining the CPUC from enforcing it; and (3) an order requiring Pac-West to return the approximately $10 million AT&T had paid it in accordance with the CPUC's decision.[14] Following cross-motions for summary judgment, the district court granted summary judgment to Pac-West and the CPUC, upholding the CPUC's decision in all respects. *See AT&T Commc'ns v. Pac-West Telecomm,* No. C 06-07271, 2008 WL 3539669, at *1 (N.D. Cal. Aug. 12, 2008). With regard to the applicability of *ISP Remand Order*'s ISP compensation regime to "the manner in which two CLECs may be compensated for the exchange ISP-bound traffic," the district court held that "this issue was not before the FCC when it crafted the *ISP Remand Order*," and so the *ISP Remand Order* did not preempt the CPUC's decision. *Id.* at *3 (citation omitted). AT&T timely appealed.

After oral argument on this appeal, we invited the FCC to

---

[13]"Under 28 U.S.C. § 1331, a district court has jurisdiction to review a decision by the CPUC to ensure compliance with federal law." *Global NAPs Cal.*, 624 F.3d at 1231 n.3 (citing *Verizon Md. Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 642 (2002)); *see also Pacific Bell*, 325 F.3d at 1124 ("In Verizon Maryland, the Supreme Court held that 28 U.S.C. § 1331 provides a basis for jurisdiction over an ILEC's claim that a state regulatory commission's order requiring reciprocal compensation for ISP-bound calls is preempted by federal law." (citation omitted)). Because we have jurisdiction, we do not consider whether there is a cause of action on which AT&T is entitled to go forward, as that question is not jurisdictional and has not been raised. *See Western Radio Servs. Co.*, 530 F.3d at 1193.

[14]Since April 13, 2007, and pursuant to Rule 67(a) of the Federal Rules of Civil Procedure, AT&T has deposited the monies it would be obliged to pay Pac-West under the CPUC's decision with the district court. Following its grant of summary judgment to Pac-West and the CPUC, the district court stayed the execution of its judgment, and AT&T has continued to deposit the sums purportedly owed Pac-West during the pendency of this appeal.

submit its views regarding the scope of the *ISP Remand Order*. The FCC accepted the invitation and submitted an amicus brief on February 11, 2011, to which the parties responded several weeks later.

## DISCUSSION

We review the district court's grant of summary judgment de novo. *See Pacific Bell*, 325 F.3d at 1123 n.8. In so doing, "we review *de novo* whether the CPUC's orders are consistent with the [TCA] and the implementing regulations, and we review all other issues under an arbitrary and capricious standard." *Id.*

**[1]** We begin with a few well-settled principles. First, there is no question that, for jurisdictional purposes, ISP-bound traffic is interstate in nature. *See Pacific Bell*, 325 F.3d at 1126. ISP-bound traffic is therefore subject to the FCC's congressionally-delegated jurisdiction. *See Core Commc'ns*, 592 F.3d at 143-44. Within this ambit, the FCC's actions can preempt state regulation to the contrary. *See Barrientos v. 1801-1825 Morton LLC*, 583 F.3d 1197, 1208 (9th Cir. 2009) (citing *City of N.Y. v. FCC*, 486 U.S. 57, 63-64 (1988)); *see also Wyeth v. Levine*, 129 S. Ct. 1187, 1201 (2009).

But, as the district court noted, "[a] matter may be *subject* to FCC jurisdiction without the FCC having exercised that jurisdiction and preempted state regulation." 2008 WL 3539669, at *7 (quoting *Global NAPs, Inc. v. Verizon New Eng., Inc.*, 444 F.3d 59, 71 (1st Cir. 2006) (hereinafter "*Global NAPs I*")). Determining whether the FCC has chosen to displace state law turns on the scope of its intent in exercising its jurisdiction. *See Barrientos*, 583 F.3d at 1208.

In issuing the *ISP Remand Order*, the FCC clearly understood that it was displacing at least some state laws. *See ISP Remand Order,* 16 F.C.C.R. at 9189 ¶ 82 ("Because we now exercise our authority under section 201 to determine the

appropriate intercarrier compensation for ISP-bound traffic, however, state commissions will no longer have authority to address this issue."). Nonetheless, it is also well settled that, with the *ISP Remand Order* and related pronouncements, the FCC has *not* exercised its jurisdiction over *all* manifestations of ISP-bound traffic. For example, this Court held in *Peevey* that the CPUC correctly interpreted the *ISP Remand Order* as not applying to interexchange (that is, non-local) ISP-bound traffic. *See* 462 F.3d at 1159. Other courts have reached the same conclusion. *See Global NAPs I*, 444 F.3d at 72; *Global NAPs, Inc. v. Verizon New Eng., Inc.*, 603 F.3d 71, 81-82 (1st Cir. 2010) ("*Global NAPs III*") (same, even after *ISP Mandate Order*); *cf. Global NAPs, Inc.* v. *Verizon New Eng., Inc.*, 454 F.3d 91, 98 (2d Cir. 2006) ("*Global Naps II*") (holding that the FCC did not intend "to preempt the state commissions' authority to define local calling areas for the purposes of intercarrier compensation").

**[2]** In sum, it is well settled that the *ISP Remand Order* has preemptive effect with regard to the ISP-related issues it encompasses. The operative question in this case, then, is whether the *ISP Remand Order* evidences the FCC's intent to exercise its jurisdiction over local ISP-bound traffic exchanged between two CLECs.

## I.

**[3]** We begin with the FCC's language choice in that order. To facilitate our inquiry, we reproduce the paragraph of the *ISP Remand Order* setting forth the "new markets" rule in its entirety:

> [A] different rule applies in the case where *carriers* are not exchanging traffic pursuant to interconnection agreements prior to adoption of this Order (where, for example, a new *carrier* enters the market or an existing *carrier* expands into a market it previously had not served). In such a case, as of the effec-

tive date of this Order, *carriers* shall exchange ISP-bound traffic on a bill-and-keep basis during this interim period. We adopt this rule for several reasons. First, our goal here is to address and curtail a pressing problem that has created opportunities for regulatory arbitrage and distorted the operation of competitive markets. In so doing, we seek to confine these market problems to the maximum extent while seeking an appropriate long-term resolution in the proceeding initiated by the companion [Notice of Proposed Rulemaking]. Allowing *carriers* in the interim to expand into new markets using the very *intercarrier* compensation mechanisms that have led to the existing problems would exacerbate the market problems we seek to ameliorate. For this reason, we believe that a standstill on any expansion of the old compensation regime into new markets is the more appropriate interim answer. Second, unlike those *carriers* that are presently serving ISP customers under existing interconnection agreements, *carriers* entering new markets to serve ISPs have not acted in reliance on reciprocal compensation revenues and thus have no need of a transition during which to make adjustments to their prior business plans.

*ISP Remand Order*, 16 F.C.C.R. at 9188-89 ¶ 81 (emphases added, footnote omitted). Use of the broad terms "carrier" and "intercarrier compensation," the former of which is a statutorily-defined term encompassing both CLECs and ILECs,[15] suggests an intent to apply the "new markets" rule to *all* intercarrier relationships, not solely to ILEC-CLEC arrangements.

**[4]** Moreover, the FCC at other junctures in the *ISP Remand Order* referred specifically to ILECs and CLECs,

---

[15]*See* note 2, *supra*.

further indicating that the terms "carrier" and "LECs,"[16] used throughout the order, applied generally to *all* "carriers," except as otherwise stated. For example, in the paragraph describing the "mirroring" rule—which, everyone agrees, applies only to ILECs—the *ISP Remand Order* referred specifically to ILECs seven times; not once did it use the generic term "LEC" or refer to CLECs. *See ISP Remand Order*, 16 F.C.C.R. at 9193 ¶ 89. Ordinarily, we presume that the use of "different words in connection with the same subject" signifies that the drafter intended to convey different meanings by its disparate word choice.[17] *Arizona Health Care Cost Containment Sys. v. McClellan*, 508 F.3d 1243, 1250 (9th Cir. 2007); *see also Warre v. Comm'r of the SSA*, 439 F.3d 1001, 1005 (9th Cir. 2006).

Nonetheless, the CPUC and the district court held that other portions of the *ISP Remand Order* indicate an intent to apply the entire interim compensation regime *only* to ILEC-CLEC combinations. For example, just after describing the "new

---

[16]"Local exchange carrier," like "carrier," is a statutorily-defined term. *See* 47 U.S.C. § 153(32) ("The term 'local exchange carrier' means any person that is engaged in the provision of telephone exchange service or exchange access.").

[17]This canon of interpretation is most commonly associated with statutes and regulations. *See McClellan,* 508 F.3d at 1250; *Boeing Co. v. United States*, 258 F.3d 958, 967 (9th Cir. 2001) ("[T]enets of statutory construction apply with equal force to the interpretation of regulations." (citation omitted)). The *ISP Remand Order* is neither a statute nor a regulation. But issues of form aside, just as in interpreting a judicial opinion, *see Michigan v. Mosley*, 423 U.S. 96, 109-10 (1975) (White, J., concurring), or a contract, *see Montana v. Wyoming*, ___ S. Ct. ___, 2011 WL 1631038, at *14 (2011) (Scalia, J., dissenting); *Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 205 (1991); *Panaview Door & Window Co. v. Reynolds Metals Co.*, 255 F.2d 920, 925 (9th Cir. 1958), applying the canon in this context simply makes sense. The precision with which the FCC used the terms "ILECs," "CLECs," and "carriers" throughout the *ISP Remand Order* demonstrates that it "act[ed] intentionally and purposely" when it used the disparate terms. *See Atl. Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 433 (1932).

markets" rule, the *ISP Remand Order* stated that "[t]he interim compensation regime we establish here applies as carriers renegotiate expired or expiring interconnection agreements. It does not alter existing contractual obligations . . . ." *ISP Remand Order*, 16 F.C.C.R. at 9189 ¶ 82. The district court reasoned that because "only ILECs have a duty to negotiate interconnection agreements, . . . . [t]hat fact suggests that the FCC was focused on the relationship between ILECs and CLECs when it crafted the *ISP Remand Order*." 2008 WL 3539669, at *9.

The CPUC and the district court found further evidence that the FCC was concerned only with CLECs taking advantage of ILECs in the description of the "mirroring" rule. In setting forth that rule, the *ISP Remand Order* explained:

> It would be unwise as a policy matter, and patently unfair, to allow incumbent LECs to benefit from reduced intercarrier compensation rates for ISP-bound traffic, with respect to which they are net payors, while permitting them to exchange traffic at state reciprocal compensation rates, which are much higher than the caps we adopt here, when the traffic imbalance is reversed. Because we are concerned about the superior bargaining power of incumbent LECs, we will not allow them to "pick and choose" intercarrier compensation regimes, depending on the nature of the traffic exchanged with another carrier. The rate caps for ISP-bound traffic that we adopt here apply, therefore, *only* if an incumbent LEC offers to exchange all traffic subject to section 251(b)(5) at the same rate. Thus, if the applicable rate cap is $ .0010/mou, the ILEC must offer to exchange section 251(b)(5) traffic at that same rate. Similarly, if an ILEC wishes to continue to exchange ISP-bound traffic on a bill and keep basis in a state that has ordered bill and keep, it must offer to exchange all section 251(b)(5) traffic on a bill and

keep basis. For those incumbent LECs that choose *not* to offer to exchange section 251(b)(5) traffic subject to the same rate caps we adopt for ISP-bound traffic, we order them to exchange ISP-bound traffic at the state-approved or state-arbitrated reciprocal compensation rates reflected in their contracts. This "mirroring" rule ensures that incumbent LECs will pay the same rates for ISP-bound traffic that they receive for section 251(b)(5) traffic.

*ISP Remand Order*, 16 F.C.C.R. at 9193 ¶ 89 (footnotes omitted). As previously mentioned, the "mirroring" rule reflects the FCC's concern for the possibility of a different kind of arbitrage created by the new rules: that ILECs, responsible for terminating the majority of non-ISP-bound local traffic, would be able to avoid paying anything to CLECs for ISP-bound traffic (or paying the capped rate for ISP-bound traffic if the ILEC and CLEC had an agreement) while still receiving uncapped compensation for all other types of traffic.

The district court reasoned that "[i]f the FCC was concerned about the possibility of regulatory arbitrage between two CLECs, it is reasonable to assume that it would have required the mirroring rule to apply to all LECs." 2008 WL 3539669, at *10. The CPUC reasoned similarly in its decision —that if the "new markets" rule could be applied in the absence of a mirroring offer, then CLECs could exploit this new opportunity for arbitrage by " 'pick[ing] and choos[ing]' intercarrier compensation regimes" depending on the type of traffic being exchanged, the very concern that led the FCC to adopt the "mirroring" rule and apply it to ILECs. *See* 2006 WL 1910202, at *11. This potential loophole, created only if the "new markets" rule applies absent a mirroring offer, led both the CPUC and the district court to hold that the FCC must have meant to apply the entire interim compensation regime for ISP-bound traffic solely to ILEC-CLEC relationships.

**[5]** Although the *ISP Remand Order* could be clearer, we are convinced that the CPUC and the district court erred in holding that it does not apply to ISP-bound traffic exchanged between two CLECs. At base, the rules implemented by the *ISP Remand Order* addressed a particular problem: the opportunity for regulatory arbitrage created by application of the prevailing reciprocal compensation scheme to local ISP-bound traffic. As discussed, ISP-bound traffic is uniquely unidirectional, and for that reason, incompatible with a compensation regime that assumes relative traffic parity. The defining feature of the problem the FCC sought to remedy is thus the type of *traffic* being exchanged—ISP-bound traffic. It is true that, at the time the *ISP Remand Order* was issued, the arbitrage problem was manifesting in a particular LEC-to-LEC relationship: new CLECs, free to pick and choose particular types of customers that would generate lots of unidirectional traffic (ISPs), were taking advantage of the then-prevailing reciprocal compensation regime at the expense of ILECs, who, prior to the passage of the Act and the entry of CLECs, served *all* customers within a particular area, and therefore maintained those customers unless and until they were lured away by CLECs. *See ISP Remand Order*, 16 F.C.C.R. at 9162 ¶ 21. But the dominance of that CLEC-ILEC arrangement was, as this case demonstrates, both transient and in no way essential to the market distortions the FCC was trying to remedy.

**[6]** Both the 1999 *Declaratory Ruling* and the 2001 *ISP Remand Order* reflect that the FCC was well aware that the market distortion problem was not limited to ILEC-CLEC arrangements, and so addressed the problem of ISP-bound traffic generally, regardless of the precise type of LEC-to-LEC relationship in which it was manifested. The *Declaratory Ruling*, which first held that ISP-bound traffic was jurisdictionally interstate, but chose not to impose a federal rule regarding how that traffic ought to be compensated, described the question that had arisen as "whether a local exchange carrier (LEC) is entitled to receive reciprocal compensation for

traffic that it delivers to an information service provider, particularly an Internet service provider (ISP)." 14 F.C.C.R. at 3689 ¶ 1. The FCC noted: "This question sometimes has been posed more narrowly, *i.e.*, whether an incumbent LEC must pay reciprocal compensation to a competitive LEC (CLEC) that delivers incumbent LEC-originated traffic to ISPs," but stated that "[b]ecause the pertinent provision of the 1996 [TCA] pertains to all LECs, we examine this issue in the broader context." *Id.* at 3689-90 n.1 (citing 47 U.S.C. § 251(b)(5)).

[7] Similarly, in the *ISP Remand Order*, the FCC presented the question it was answering as "whether reciprocal compensation obligations apply to the delivery of calls from one LEC's end-user customer to an ISP in the same local calling area that is served by a competing LEC." 16 F.C.C.R. at 9159 ¶ 13. As with "carrier," "local exchange carrier" is a statutorily-defined term that encompasses *both* CLECs and ILECs. *See* note 16, *supra*. In concluding that ISP-bound traffic was not subject to § 251(b)(5)'s reciprocal compensation requirement, moreover, the *ISP Remand Order* repeatedly indicates that it is the nature of the *traffic*, not the particular intercarrier relationship, that prompted the FCC to institute the interim rules.[18] *See, e.g.*, 16 F.C.C.R. at 9162 ¶ 19 ("The Commission has struggled with how to treat Internet traffic for regulatory purposes."); *id.* at 9162 ¶ 20 ("The issue of intercarrier compensation for Internet-bound traffic with which we are presently wrestling is a manifestation of this growing challenge."); *id.* at 9163 ¶ 23 ("ISP-bound traffic is not subject to the reciprocal compensation requirement in section 251(b)."); *id.* at 9165 ¶ 30 ("Congress intended to exempt

---

[18]As previously indicated, the D.C. Circuit in *WorldCom*, 288 F.3d at 434, rejected much of the *ISP Remand Order*'s legal justification for the FCC's interim compensation regime, which was based on 47 U.S.C. § 251(g), although it did not vacate the interim rules. Nonetheless, the FCC's reasoning remains essential to understanding the *scope* of the *ISP Remand Order*, which was not changed by *WorldCom*.

certain enumerated categories of service from section 251(b)(5) when the service was provided to interexchange carriers or information service providers. The exemption focuses not only on the nature of the service, but on to whom the service is provided. "); *id.* at 9167 ¶ 34 ("Congress intended to exclude the traffic listed in subsection (g) from the reciprocal compensation requirements of subsection (b)(5)."); *id.* ¶ 35 ("[W]e conclude that ISP-bound traffic is not subject to the reciprocal compensation provisions of section 251(b)(5)."); *id.* at 9168 ¶ 37 ("Congress excluded all such [ISP-bound] access traffic from the purview of section 251(b)(5)."); *id.* at 9172 ¶ 44 ("We conclude that this definition of 'information access' [in § 251(g)] was meant to include all access traffic that was routed by a LEC 'to or from' providers of information services, of which ISPs are a subset."); *id.* at 9175 ¶ 52 ("Having found that ISP-bound traffic is excluded from section 251(b)(5) by section 251(g), we find that the Commission has the authority pursuant to section 201 to establish rules governing intercarrier compensation for such traffic."); *see also ISP Mandate Order*, 24 F.C.C.R. at 6476 ¶ 1 ("[W]e conclude that we have authority to impose ISP-bound traffic rules.").

**[8]** Although not presented with the precise issue before us, other courts have similarly described the *ISP Remand Order* as applying to ISP-bound traffic exchanged between two LECs, not distinguishing traffic originating with ILECs or terminating with CLECs. *See Peevey*, 462 F.3d at 1147 ("In the *ISP Remand Order*, the FCC held that § 251(g) carves out a category of telecommunications traffic not subject to the reciprocal compensation requirement of § 251(b)(5), and that ISP-bound traffic is within this category. . . . This was done to eliminate the regulatory arbitrage opportunity available to CLECs." (citations omitted)); *Core Commc'ns*, 592 F.3d at 141 ("At least as early as 1999 the [FCC] was concerned that the regulatory procedures under which the sending LEC compensated the recipient LEC were leading to the imposition of excessive rates, and that these

rates in turn were distorting the markets for internet and telephone services."); *In re Core Commc'ns*, 455 F.3d at 273 ("The Commission adopted 'rate caps,' which established a gradually declining maximum rate that a carrier (*typically*, a CLEC) could charge another carrier (*typically*, an ILEC) for delivering a call to an ISP. Although the rate caps limited how much carriers could recover from other carriers, the carriers remained free to recover '[a]ny additional costs . . . from end-users,' that is, from their own customers." (quoting the *ISP Remand Order*, 16 F.C.C.R. at 9156 ¶ 4 (emphases added, some citations omitted, alterations in original)); *Global NAPs II*, 454 F.3d at 99 ("The ultimate conclusion of the [*ISP*] *Remand Order* was that ISP-bound traffic *within a single calling area* is not subject to reciprocal compensation."); *World-Com*, 288 F.3d at 430 (explaining that, in the *ISP Remand Order*, the FCC "held that under § 251(g) of the [TCA] it was authorized to 'carve out' from § 251(b)(5) calls made to [ISPs] located within the caller's local calling area").

In sum, in adopting an interim compensation regime for ISP-bound traffic, the FCC was primarily concerned with arbitrage opportunities created by *traffic* of a particular nature; we therefore measure the scope of the FCC's intent with regard to the reach of the *ISP Remand Order* on the same basis. It is true that the FCC was *also* concerned with how its new rules would play out in a regulatory environment in which ILECs dominated the marketplace. For that reason, the FCC adopted the "mirroring" rule, ensuring that the ILECs would not unduly benefit from their dominant market position. But this concern for new arbitrage opportunities that ILECs were uniquely positioned to exploit was a corollary to the FCC's overriding concern for the arbitrage opportunities created by ISP traffic generally. And as this case demonstrates, arbitrage related to ISP-bound traffic in no way depends on the participation of an ILEC. The *ISP Remand Order* reflects this reality, imposing its rules on *all* LECs, with the exception of the "mirroring" rule, which the FCC singled out as applicable only to ILECs.

The only verbiage in the various FCC orders concerning ISP-bound traffic that supports Appellees' view is one paragraph of the 2004 *Core Order* discussing the "new markets" rule, which states:

> [T]he Commission concluded that different interim intercarrier compensation rules should apply if two carriers were not exchanging traffic pursuant to an interconnection agreement prior to the adoption of the *ISP Remand Order*. In this situation, if an *incumbent LEC* has opted into the federal rate caps for ISP-bound traffic, the two carriers must exchange this traffic on a bill-and-keep basis during the interim period (the "new markets" rule). This rule applies, for example, when a new carrier enters a market or an existing carrier expands into a market it previously had not served. The Commission implemented this rule in order to confine the opportunities for regulatory arbitrage to the maximum extent while seeking an appropriate long-term resolution for the problems associated with the existing intercarrier compensation regime.

*Core Order*, 19 F.C.C.R. at 20182 ¶ 9 (emphasis added). The district court reasoned that this paragraph indicates that the FCC "did not intend the New Markets Rule to apply broadly to any carriers that were not exchanging traffic pursuant to an interconnection agreement. Rather, it intended the New Markets Rule to apply when a CLEC requested interconnection from an ILEC, after the effective date of the *ISP Remand Order*." 2008 WL 3539669, at *9.

The district court misread ¶ 9 of the *Core Order* by construing it without attending to its context. Coming, as it does, just after a discussion of the "mirroring" rule, which applies only to ILECs, *see* 19 F.C.C.R. at 20181-82 ¶ 8, it is almost surely not intended as an exhaustive treatment of the "new markets" rule. Instead, the paragraph explains how the rule

would apply to an ILEC that has "opted into the federal rate caps for ISP-bound traffic." *Id.* at 20182 ¶ 9. Given the FCC's concern for ILEC arbitrage opportunities created by the new rules, ¶ 9 is best understood as a reiteration that an ILEC cannot simultaneously benefit from the "new markets" rule when a new CLEC enters a market, and ignore the rate caps in its dealings with other CLECs with whom the ILEC had previously been exchanging traffic. *Cf. id.* at 20186 ¶ 19 ("Nor does [Petitioner] address the Commission's concern that, without the mirroring rule, incumbent LECs would too easily be able to take advantage of the discrepancy between reduced rates for ISP-bound traffic and higher rates for section 251(b)(5) voice traffic. The mirroring rule was adopted to preclude incumbent LECs from paying reduced intercarrier compensation rates for ISP-bound traffic, which they send to competitive LECs, while collecting higher state reciprocal compensation rates for traffic that they receive.").

Other parts of the *Core Order* indicate, once more, that the FCC's primary focus was on the *type* of traffic creating arbitrage opportunities, without distinguishing (beyond the "mirroring" rule) between types of carriers. *See, e.g.*, *id.* at 20181 ¶ 5 (explaining that in the *ISP Remand Order*, "[t]he Commission found that the availability of reciprocal compensation for this type of traffic [ISP-bound] undermined the operation of competitive markets because *competitive* LECs were able to recover a disproportionate share of their costs from *other* carriers, thereby distorting the price signals sent to their ISP customers.") (emphases added). Given this context and the remainder of the *Core Order*, as well as the general references to "carriers" and "LECs" throughout the other pertinent orders, ¶ 9 of the *Core Order* simply cannot bear the weight the CPUC and the district court placed upon it.

The district court also pointed to the FCC's 2001 Notice of Proposed Rulemaking (*NPRM*), issued the same day as the *ISP Remand Order*, as evidence that the FCC did not intend

to apply the interim compensation regime to CLEC-CLEC relationships. The district court explained:

> [I]n the *NPRM*, the FCC stated that it did not "expect to extend compensation rules to other interconnection arrangements that are not currently subject to rate regulation and *that do not exhibit symptoms of market failure*." *NPRM*, 16 F.C.C.R. at 9612 ¶ 2 (emphasis added). The FCC explained this statement by noting that, "we do not contemplate a need to adopt new rules governing CLEC-to-CLEC . . . arrangements." *Id.* at 9675 n.2. From this statement, one can infer that FCC did not believe that CLEC-to-CLEC relationships exhibited the types of market failure underlying its concerns about regulatory arbitrage. This provides further support for the Court's conclusion that the FCC was not focused on compensation arrangements between two CLECs when it crafted the *ISP Remand Order*.

2008 WL 3539669, at *10.

This reasoning, however, can easily be flipped over. It is equally plausible—likely more so—to interpret the *NPRM*'s statement as an acknowledgment that the FCC did not foresee the situation presented here: a CLEC taking advantage of the secondary arbitrage opportunity created by the interim rules themselves—that is, benefitting from the "new markets" rule while not being required to make a "mirroring" offer. Of course, CLEC-to-CLEC relationships "d[id] not exhibit symptoms of market failure" at the time; the market failure presented in this case is only possible because of the interim compensation rules themselves, which were issued *the same day* as the *NPRM*. We therefore take the *NPRM* footnote at face value: the FCC "d[id] not contemplate a need to adopt *new* rules governing CLEC-to-CLEC . . . arrangements." 16

F.C.C.R. at 9675 n.2 (emphasis added)—that is, rules other than those already adopted in the *ISP Remand Order*.[19]

**[9]** In conclusion, the district court and the CPUC erred in holding that the *ISP Remand Order*'s interim compensation regime did not apply to the ISP-bound traffic exchanged between AT&T and Pac-West. Because we hold that the *ISP Remand Order* does apply to the ISP-bound traffic at issue here, the CPUC's decision to rely on Pac-West's state-filed tariffs to set the rate in question is preempted. *See Barrientos*, 583 F.3d at 1208.

## II.

Strongly bolstering our conclusion are the views of the FCC itself. Following oral argument, the FCC was invited to submit a brief as amicus curiae addressing "whether the interim compensation regime established by [the *ISP Remand Order*] . . . govern[s] the compensation due one [CLEC] for the termination of presumptively ISP-bound traffic originating with another CLEC, where the traffic is indirectly exchanged and the two CLECs do not have an interconnection agreement." The FCC accepted the invitation and answered in the affirmative, explaining that "the regulatory language, the FCC's description of the scope of its compensation regime, and the regulatory purpose demonstrate that the new markets rule (until forborne from on October 18, 2004) and the rate caps . . . apply to CLEC-to-CLEC ISP-bound traffic." Brief for the FCC as Amicus Curiae at 15.

With regard to the language of the *ISP Remand Order*, the FCC points out, as we have, that the order "made it clear that [the] compensation regime applies 'when *carriers* collaborate to deliver calls to ISPs.'" *Id.* at 18 (quoting *ISP Remand Order*, 16 F.C.C.R. at 9181 ¶ 66 (emphasis in original)).

---

[19]A "new rule" that perhaps the FCC should have considered, but did not, is applying a "mirroring" offer requirement to CLECs.

"[H]ad it intended its compensation rules to apply only to ILEC-to-CLEC ISP-bound traffic," the FCC explains, the *ISP Remand Order* "would not have used repeatedly the inclusive terms 'carriers' and 'LECs.'" *Id.* at 19.

The FCC also explains, as we also have done, that the "opportunities for regulatory arbitrage . . . occur under a reciprocal compensation system regardless of the identity of the originating carrier as an ILEC or a CLEC." *Id.* at 21. "Interpreting the compensation rules to apply only to ILEC-to-CLEC ISP-bound traffic," moreover,

> would create a loophole in the FCC's regulatory regime for CLEC-originated ISP-bound calls. As to that traffic, it would thwart full achievement of the regulatory purpose by leaving unabated the very regulatory arbitrage opportunities and economic distortions that the FCC sought to alleviate by the adoption of its intercarrier compensation rules.

*Id.*

Although we do not defer to "an agency's *conclusion* that state law is pre-empted," *Wyeth*, 129 S. Ct. at 1201, we do defer to the FCC's interpretation of the compensation regime that it created, barring some "reason to suspect that the interpretation does not reflect the agency's fair and considered judgment on the matter in question." *Chase Bank USA, N.A. v. McCoy*, 131 S. Ct. 871, 881 (2011) (quoting *Auer v. Robbins*, 519 U.S. 452, 462 (1997)); *see also Talk Am., Inc. v. Mich. Bell Tel. Co.*, ___ S. Ct. ___, 2011 WL 2224429, at *6 (2011) ("In the absence of any unambiguous statute or regulation, we turn to the FCC's interpretation of its regulations in its *amicus* brief."). No such reason exists here, particularly given that the FCC's reasoning mirrors our own and that the FCC is best positioned to describe the reach of its own orders.

## CONCLUSION

**[10]** In conclusion, we hold that the *ISP Remand Order* governs the traffic exchanged between AT&T and Pac-West and therefore reverse the district court's grant of summary judgment to the CPUC and Pac-West.

**REVERSED.**[20]

---

[20]In light of our holding, we do not reach AT&T's alternative argument that the CPUC lacked jurisdiction to adjudicate the dispute in this case. This case is not an appeal of the CPUC's order. It is, rather, an affirmative challenge to it brought under the Supremacy Clause and 28 U.S.C. § 1331. *See* note 13, *supra*. Once we determine that the CPUC's order is invalid—as we have done—the question whether it could have issued a different order is not before us.

# APPENDIX: GLOSSARY OF TERMS

Bill-and-keep:    An intercarrier compensation arrangement whereby a carrier "bills" its own customers and "keeps" the revenue—i.e., where neither interconnecting carrier charges the other for the termination of telecommunications traffic that originates on the other carrier's network. *See* 47 C.F.R. § 51.713(a).

carrier:    With some exceptions not relevant to this case, "any person engaged as a common carrier for hire, in interstate or foreign communication by wire or radio or in interstate or foreign radio transmission of energy." 47 U.S.C. § 153(11).

CLEC:    Competitive local exchange carrier; a LEC that entered a particular market following passage of the TCA.

CPUC:    California Public Utilities Commission.

FCC:    Federal Communications Commission.

ISP:    Internet service provider; a company that provides internet access to individuals; most relevant to this case are those that provide dial-up internet access.

LEC:    Local exchange carrier; generally responsible for "local" (non-toll) telecommunications traffic within a telephone exchange; can be one of two types: an ILEC or a CLEC. *See* 47 U.S.C. § 153(32) (defining "[l]ocal exchange carrier"); *id.* § 153(54) (defining "[t]elephone exchange service").

ILEC:                Incumbent local exchange carrier; in gen-
                     eral, refers to those LECs that enjoyed
                     monopoly status prior to the TCA. *See* 47
                     U.S.C. § 251(h).

mou:                 Minutes of use; how telecommunications
                     traffic is counted for billing purposes.

reciprocal
compensation:        An arrangement between two carriers
                     whereby "each of the two carriers receives
                     compensation from the other carrier for the
                     transport and termination on each carrier's
                     network facilities of telecommunications
                     traffic that originates on the network facili-
                     ties of the other carrier." 47 C.F.R.
                     § 51.701(e).

TCA:                 Telecommunications Act of 1996, Pub. L.
                     No. 104-104, 110 Stat. 56 (codified as
                     amended in scattered sections of 47
                     U.S.C.).