# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

GLOBAL NAPS CALIFORNIA, INC.,
*Petitioner-Appellant,*

v.

PUBLIC UTILITIES COMMISSION OF
THE STATE OF CALIFORNIA,
*Respondent-Appellee.*

No. 09-55600

D.C. No.
2:07-cv-04801-
MMM-SS

OPINION

Appeal from the United States District Court
for the Central District of California
Margaret M. Morrow, District Judge, Presiding

Argued and Submitted
May 3, 2010—Pasadena, California

Filed October 28, 2010

Before: Diarmuid F. O'Scannlain and Richard C. Tallman,
Circuit Judges, and Joan Humphrey Lefkow,
District Judge.*

Opinion by Judge O'Scannlain

*The Honorable Joan Humphrey Lefkow, United States District Judge
for the Northern District of Illinois, sitting by designation.

17903

**COUNSEL**

Joel Davidow, Kile Goekijan Reed and McManus, PLLC, Washington, D.C., argued the cause for the petitioner-appellant, and filed the brief. Richard W. Davis, Davis DeYoung LLP, Los Angeles, California, and Laurie DeYoung, Davis DeYoung LLP, Los Angeles, California, were also on the briefs.

Christopher P. Witteman, California Public Utilities Commission, San Francisco, California, argued the cause for the respondent-appellee and filed the brief. Frank R. Lindh, California Public Utilities Commission, San Francisco, California,

and Helen M. Mickiewicz, California Public Utilities Commission, San Francisco, California, were also on the brief.

Christian F. Binnig, Mayer Brown LLP, Chicago, Illinois, filed a brief on behalf of amicus curiae The Southern New England Telephone Co., Illinois Bell Telephone Co., Ohio Bell Telephone Co., Pacific Bell Telephone Co., and Bell-South Telecommunications, Inc. Hans J. Germann, Mayer Brown LLP, Chicago, Illinois, and Stephen S. Sanders, Mayer Brown LLP, Chicago, Illinois, were also on the brief.

Michael E. Glover, Verizon, Arlington, Virginia, filed a brief on behalf of amicus curiae Verizon. Karen Zacharia, Verizon, Arlington, Virginia, Katharine R. Saunders, Verizon, Arlington, Virginia, and Scott H. Angstreich, Kellogg, Huber, Hansen, Todd, Evans & Figel, PLLC, Washington, DC, were also on the brief.

---

## OPINION

O'SCANNLAIN, Circuit Judge:

We must decide, among other issues, whether the California Public Utilities Commission acted arbitrarily and capriciously when it interpreted an interconnection agreement between two competitive local telephone exchange carriers as establishing the rate at which each must compensate the other for handling Voice-over-Internet-Protocol calls.

I

A

"Prior to 1996, local telephone service generally was provided by a local monopolist who offered services at prices regulated and imposed by a variety of governmental agen-

cies." *Pac. Bell Tel. Co. v. Cal. Pub. Utils. Comm'n*, 2010 WL 3421187, at *2 (9th Cir. Sept. 1, 2010). Under this system, a single local exchange carrier ("LEC") provided all telephone service in a geographically confined area known as a Local Access and Transport Area ("LATA"). The passage of the Telecommunications Act of 1996 ("Act"), Pub. L. No. 104-104, 110 Stat. 56 (codified in part at 47 U.S.C. §§ 251-261), ended this system of regulated monopolies. In its place, the Act established a competitive regime under which formerly monopolistic local-service providers, or incumbent local exchange carriers ("ILECs"), and new local-service providers, or competitive local exchange carriers ("CLECs"), compete to provide telephone service in the same LATA.

Because each of the LECs operating within a LATA owns and operates an independent network of telephone lines, the customers of each LEC may call the customers of other LECs only if these networks are interconnected. For this reason, the Act requires LECs to interconnect their networks of telephone lines with the networks of other LECs. *See* 47 U.S.C. § 251(a)(1). "Interconnection allows customers of one LEC to call the customers of another, with the calling party's LEC (the 'originating' carrier) transporting the call to the connection point, where the called party's LEC (the 'terminating' carrier) takes over and transports the call to its end point." *Verizon Cal. v. Peevey*, 462 F.3d 1142, 1146 (9th Cir. 2006).

Interconnection gives rise to a potential problem, however. If one LEC's customer calls a second LEC's customer, the second customer's LEC will not be compensated for its role in completing the call because it does not bill the caller. This is so because people do not customarily pay for *receiving* phone calls, only for placing them. *See generally* Peter W. Huber et al., *Federal Telecommunications Law* § 2.1.1, at 79-85 (2d ed. 1999) (describing the manner in which telephone-service providers are compensated for their services). To ensure that each LEC is compensated for its role in

such calls, the Act requires LECs to negotiate interconnection agreements that "establish reciprocal compensation arrangements for the transport and termination of telecommunications." 47 U.S.C. § 251(b)(5). To satisfy this obligation, LECs typically execute contracts referred to as "interconnection agreements" that establish the rate at which the originating carrier compensates the terminating carrier for completing a call. *See Global NAPs, Inc. v. Verizon New Eng., Inc.*, 505 F.3d 43, 45 (1st Cir. 2007). For such calls, the originating carrier compensates the terminating carrier at the rate set forth in the carriers' interconnection agreement, rather than under the access charge regime applicable to long-distance calls. *Id.*

Although federal law requires LECs to execute interconnection agreements, the contracts themselves are creatures of state law. *Ill. Bell Tel. Co. v. Global NAPs Ill., Inc.*, 551 F.3d 587, 591 (7th Cir. 2008); *Verizon Cal., Inc. v. Peevey*, 462 F.3d 1142, 1152 (9th Cir. 2007). Such contracts are executed under, and interpreted according to, state law. *Ill. Bell Tel. Co.*, 551 F.3d at 591. Thus, when a disagreement over the terms of such an agreement arises, "the suit is not based on federal law in any realistic sense, but on a . . . term in a contract." *Id.*

Federal law permits a LEC that believes another LEC has violated the terms of an interconnection agreement to seek redress before a state public utilities commission. *See Peevey*, 462 F.3d at 1151-52; *see also BellSouth Telecomm., Inc. v. MCImetro Access Transmission Servs.*, 317 F.3d 1270, 1274 (11th Cir. 2003) (en banc). If a party to such a proceeding believes that the state public utility commission's decision is incorrect, that party may seek review of the decision in federal court. *Verizon Md. Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 642 (2002).

Because federal law requires LECs to enter into interconnection agreements with other LECs operating within the same LATA, such agreements typically concern calls that

originate and terminate within the LATA. *See In re Imple-mentation of the Local Competition Provisions in the Tele-comms. Act of 1996*, ¶ 1034, 11 FCC Rcd. 15499, 16013 (1996). Thus, "interLATA" calls—or those that involve the transport of a call originating in one LATA and terminating in another—generally fall outside the reciprocal-compensation regime described above. *See SBC Commc'ns Inc. v. FCC*, 138 F.3d 410, 412 n.1 (D.C. Cir. 1998). Calls within a single LATA, or intraLATA calls, are often purely local, although sometimes calls between distant geographic points within a single LATA are nevertheless long-distance calls. The latter type of such calls are known as "intraLATA toll calls." *See* Huber et al., *supra*, § 9.7, at 580. Interconnec-tion agreements often set forth the rate of compensation appli-cable both to intraLATA calls and to intraLATA toll calls.

## B

This appeal arises out of a dispute between two LECs that operate in California: Global NAPs California, Inc. ("Global")[1] and Cox California Telcom, LLC ("Cox").

To comply with their section 251(a)(1) obligation to inter-connect their networks, Global and Cox executed a negotiated interconnection agreement on October 29, 2003. This agreement, the Network Interconnection Agreement ("Agreement"), established "the terms, conditions and pricing under which [Global] and Cox . . . [would] offer and provide to each other Interconnection within the state of California."

The Agreement provides that when either carrier terminates an "intraLATA toll call" that originated on the other carrier's network, the terminating carrier shall charge the originating carrier a prescribed fee based on the length of the call. The Agreement defines intraLATA toll traffic as "those

---

[1]Global also operates as a long-distance provider. Its activities in the long-distance telephone market are irrelevant to this case.

intraLATA calls that are not defined as Local Traffic in [the Agreement]." Local traffic is defined as "traffic other than ISP-bound Traffic that is originated by a Customer of one Party on that Party's network and terminates to a Customer of the other Party on that other Party's network, within a given local calling area, or expanded area service area." The Agreement further provides that "[t]he designation of traffic as Local Traffic . . . or IntraLATA Toll for purposes of compensation shall be based on the horizontal and vertical coordinates associated with the originating and terminating NPA-NXXs[2] of the call."

In June 2004, Cox terminated intraLATA toll traffic originating on Global's network and began billing Global pursuant to the Agreement. Global refused to pay. In response to Cox's invoice, Global denied the existence of the Agreement and argued that the traffic it delivered to Cox was not subject to any non-contractual compensation obligations. Specifically, Global asserted that the disputed traffic originated with its clients that provide Voice-over-Internet-Protocol ("VoIP") services to consumers, and the traffic was therefore not subject to compensation obligations under the Agreement. The Eighth Circuit has helpfully described such technology in the following way:

> VoIP is an internet application utilizing "packet-switching" to transmit a voice communication over a broadband internet connection. In that respect, it is different from the "circuit-switching" application used to route traditional landline telephone calls. In circuit-switched communications, an electrical cir-

---

[2]"Telephone numbers generally consist of ten digits in the form of NPA-NXX-XXXX. The first three digits indicate the Numbering Plan Area (or NPA), commonly known as the area code, and the next three digits refer to the exchange code. Under standard industry practice, area codes and exchange codes generally correspond to a particular geographic area served by a LEC." *Peevey*, 462 F.3d at 1147-48.

cuit must be kept clear of other signals for the dura-
tion of a telephone call. Packet-switched
communications travel in small digital packets along
with many other packets, allowing for more efficient
utilization of circuits.

*Minn. Pub. Util. Comm'n v. FCC*, 483 F.3d 570, 574 (8th Cir.
2007).

Global does not provide VoIP services directly to end
users. Instead, it contracts with VoIP providers to transfer
their broadband-Internet-based calls to traditional telephone
lines. When a customer of one of Global's clients makes a
VoIP phone call, the VoIP provider transfers that call to
Global. Global then transfers the call to the appropriate carrier
—in this case, Cox—which in turn connects the call to the
intended recipient.

C

On April 27, 2008, Cox filed a complaint with the Califor-
nia Public Utilities Commission ("CPUC"). The complaint
alleged that Cox had been terminating intraLATA toll calls
for Global since June 2004, and that Global had failed to pay
Cox for terminating those calls in accordance with the Agree-
ment. Cox asked that the CPUC order Global "to pay all
amounts due to Cox under the [Agreement] for the termina-
tion of intraLATA toll calls, including past due amounts and
interest" and "to make all future payments due to Cox under
the [Agreement]."

In its answer, Global admitted that it had executed the
Agreement with Cox, but denied that it had breached it. In
response to Cox's claim that Global had failed to compensate
Cox for terminating intraLATA toll calls, Global acknowl-
edged that "the sole area of dispute presented in the complaint
relates to compensation for the termination by Cox of
intraLATA toll calls within the state of California." It denied

that the relevant traffic was subject to the Agreement's intraLATA-toll-call provision, however, claiming that the traffic "arises from an enhanced service provider" and is therefore "subject to an exemption" from "access charges" created by federal regulations.

After Global answered the complaint, Cox filed a motion for summary judgment, which the CPUC granted. Turning first to the text of the Agreement, the CPUC concluded that the disputed traffic fell within the Agreement's intraLATA-toll-traffic provision because Global had admitted that the traffic at issue was intraLATA toll traffic. Turning to Global's legal claims, the CPUC rejected its claim that federal law exempts VoIP traffic from contractual compensation obligations.

After Global refused to pay Cox in accordance with the CPUC's order, the CPUC issued a second order suspending Global's authorization to operate as a telecommunications provider in California until Global compensated Cox as required by the CPUC's order.

D

Global filed a petition for review in the U.S. District Court for the Central District of California. Global sought review of both the CPUC's order requiring it to pay Cox in accordance with the Agreement and the CPUC's order suspending Global's right to operate as a telecommunications provider in California.[3] Global's petition identifies the CPUC—not Cox—as the respondent.

After denying Global's motion for a preliminary injunction, the district court granted the CPUC's motion for judgment on

---

[3]Under 28 U.S.C. § 1331, a district court has jurisdiction to review a decision by the CPUC to ensure compliance with federal law. *See Verizon Md. Inc.*, 535 U.S. at 642.

the administrative record. Conducting a de novo review, the district court agreed with the CPUC's conclusion that federal law permitted the CPUC to enforce the Agreement with respect to Global's VoIP traffic. Turning to the CPUC's interpretation of the Agreement, the district court upheld the CPUC's conclusion that the Agreement required Global to compensate Cox for terminating Global's VoIP-originated traffic. Global timely appealed from the district court's judgment.

## II

Global contends that the CPUC's interpretation of the Agreement, and the procedures it used to arrive at that interpretation, violated applicable California law, and thus the district court erred in concluding otherwise.[4] We are deferential to the CPUC's interpretation of state law, and a petition for review may be granted only if its application of state law was arbitrary and capricious. *Peevey*, 462 F.3d at 1150. "A state commission's decision is arbitrary and capricious if the decision was not supported by substantial evidence or the commission made a clear error of judgment." *Id.* (internal quotation marks and citation omitted).

## A

Global argues that the CPUC acted arbitrarily and capriciously by concluding that the Agreement's definition of intraLATA toll traffic includes the VoIP traffic Global forwarded to Cox. The Agreement defines intraLATA toll traffic as "those intraLATA calls that are not defined as Local Traffic in [the Agreement]." The Agreement further provides that "[t]he designation of traffic as Local Traffic . . . or IntraLATA

---

[4]We review the district court's decision to grant summary judgment de novo. *Peevey*, 462 F.3d at 1150. In reviewing the CPUC's determinations, we apply the same standards the district court should apply. *U.S. W. Commc'ns v. MFS Intelenet, Inc.*, 193 F.3d 1112, 1117 (9th Cir. 1999).

Toll for purposes of compensation shall be based on the horizontal and vertical coordinates associated with the originating and terminating NPA-NXXs of the call." Because VoIP calls are carried over the Internet, rather than traditional phone lines, Global argues that classifying a VoIP call as "local" or "intraLATA toll" based on the location associated with the NPA-NXX of the phone number that initiated the call is inappropriate.

[1] We reject Global's argument. The CPUC's characterization of Global's VoIP traffic as intraLATA toll traffic came from Global itself. In response to the complaint Cox filed with the CPUC, Global "admit[ted] that the sole area of dispute presented in the complaint relates to compensation for the termination by Cox of intraLATA toll calls within the state of California." Based on this concession, the CPUC concluded that there was no dispute that "[a]ll the calls for which Cox has billed Global . . . are intra-LATA toll calls."

[2] Moreover, Global's claim that it is technologically infeasible to classify its VoIP traffic based on the coordinates associated with the NPA-NXX of the phone number initiating the phone call is not supported by the record. Before the CPUC, Cox offered evidence showing that the NPA-NXX associated with the origination point of each of the disputed calls was "located within the LATA, but outside the local calling area, of the Cox end-user customer receiving the call." Given that the Agreement defines intraLATA toll traffic as traffic that travels within a single LATA, but crosses the boundary of a local calling area, this traffic falls within the Agreement's definition of intraLATA toll traffic. Global has offered no evidence that Cox has attempted to bill it for traffic whose NPA-NXX does not meet the definition of intraLATA toll traffic set forth in the Agreement. Thus, the district court properly ruled that the CPUC did not act arbitrarily and capriciously in concluding that Global's VoIP traffic is subject to

the termination charges the Agreement establishes for intraLATA toll traffic.[5]

B

Global next contends that a fact hearing was necessary to determine whether its VoIP traffic fell within the Agreement's intraLATA-toll-call provision because the nature of the traffic Global delivered to Cox was in dispute. We disagree.

[3] The CPUC is empowered by the California Constitution to establish rules of procedure governing hearings before it. Cal. Const. art. XII, § 2. It has not established a definitive standard for evaluating whether summary judgment is appropriate, but it generally follows the requirements set forth in California Code of Civil Procedure § 437(c). *See Westcom Long Distance, Inc. v. Pac. Bell*, 54 C.P.U.C. 2d 244, 249 (Cal. Pub. Util. Comm'n 1994). Section 437(c) states that summary judgment is appropriate where no triable issues of material fact are present.

[4] Here, the CPUC determined that summary judgment was appropriate because the nature of the disputed traffic was immaterial to the question of contract interpretation before it. As discussed above, Global conceded that the disputed traffic was intraLATA toll traffic for billing purposes. In addition,

---

[5]Global also claims that the CPUC's interpretation of the Agreement was arbitrary and capricious because the CPUC failed to hold a fact hearing and consider extrinsic evidence as to the Agreement's meaning. Global's concession that all relevant calls were intraLATA toll calls rendered it unnecessary for the CPUC to consider extrinsic evidence of the parties' intent. Whatever the scope of the Agreement's intraLATA-toll-call provision, it certainly sets forth the rate of compensation applicable to *admittedly* intraLATA toll traffic. *Cf. Ohio Bell Tel. Co. v. Global NAPs Ohio, Inc.*, 2010 WL 987053, at *4 (S.D. Ohio Mar. 15, 2010) (denying summary judgment because an issue of fact existed regarding the nature of disputed traffic where the parties' interconnection agreement expressly exempted VoIP traffic from the intercarrier-compensation rates applicable to intraLATA toll traffic).

Global offered no evidence to demonstrate that Cox was using improper NPA-NXX information as a basis for its charges. Thus, the CPUC's determination that a fact hearing would not assist it in resolving the matter of contract interpretation before it was not arbitrary and capricious.

C

Global claims that the CPUC acted arbitrarily and capriciously by requiring Global to compensate Cox for terminating its VoIP traffic while not requiring a similarly situated LEC to compensate carriers terminating its VoIP traffic. As evidence to support this claim, Global cites a draft arbitration award issued by a CPUC arbitrator in *Petition of Level 3 Communications*, App. 04-06-004 (Cal. Pub. Utility Comm'n June 1, 2004).

Contrary to Global's assertions, however, the *Level 3* decision is in no way at odds with the CPUC's decision in this case. In *Level 3*, the administrative law judge concluded that VoIP traffic is subject to reciprocal-compensation obligations arising under federal law, and ordered the parties to negotiate an agreement establishing the rate for such charges. *Id.* at *12, *80. This is consistent with the CPUC's determination that Global should compensate Cox under the terms of the Agreement. Thus, Global's claim that the CPUC has issued inconsistent decisions is without merit.

III

Global next argues that the CPUC's conclusion that the Agreement obligates Global to pay Cox compensation for terminating VoIP traffic is contrary to federal law. We review the CPUC's interpretation of federal law de novo. *Pac. Bell v. Pac. W. Telecomm, Inc.*, 325 F.3d 1114, 1123 n.8 (9th Cir. 2003).

A

**[5]** Global contends that the CPUC's interpretation of the Agreement violates FCC regulations that, in Global's view, exempt VoIP traffic from federal access charges. First, Global argues that under an FCC order, VoIP traffic is not subject to traditional long distance access charges, citing *In re Petition for Declaratory Ruling that AT&T's Phone-to-Phone IP Telephony Services are Exempt from Access Charges* ("*IP-in-the-Middle Order*"), 19 FCC Rcd. 7457 (2004). Second, should we conclude that the FCC has not specifically exempted VoIP traffic from federal access charges, Global urges us to conclude that its traffic is nevertheless exempt under a different exemption applicable to "enhanced-service-providers." Under this exemption, telecommunications providers offering services that use "computer processing applications that act on the format, content, code, protocol or similar aspects of the subscriber's transmitted information; provide the subscriber additional, different, or restructured information; or involve subscriber interaction with stored information," 47 C.F.R. § 64.702(a), are not subject to federal access charges, *see In re IP-Enabled Servs.*, 19 FCC Rcd. 4863, 4880 (2004).

**[6]** Global's claim fails, however, because the CPUC did not require Global to pay any compensation under the federal access-charges regime. Access charges are a federally prescribed rate of compensation that long-distance carriers must pay LECs that terminate interLATA calls. *See Global NAPs v. Verizon New Eng.*, 603 F.3d 71, 77 (1st Cir. 2010) ("*GNAPs V*"). The CPUC did not require Global to compensate Cox under the federal access-charges regime. Instead, the CPUC required Global to compensate Cox "as provided in the Interconnection Agreement between the parties."

**[7]** Global argues, however, that the CPUC's decision had the *effect* of imposing access charges on Global's VoIP traffic because the rate of reciprocal compensation applicable to intraLATA toll traffic under the terms of the Agreement is the

same as the rate applicable to interLATA traffic under the federal access-charge regime. Therefore, in Global's view, the CPUC's decision is the functional equivalent of imposing access charges on the traffic Global sends to Cox. This argument fails, however, because Global's duty to compensate Cox stems from its contractual obligations. That the Agreement established a rate of compensation similar to the rate established by relevant federal regulations does not change the legal basis for Global's obligations.

[8] The very authorities Global cites to support its contention that VoIP traffic is exempt from federal access charges confirm that such traffic is subject to reciprocal-compensation obligations under section 251(b)(5). For example, in *Petition of MCImetro Access Transmission Services*, 05-MA-138, 2006 WL 2434198 (Pub. Serv. Comm'n. of Wis. May 16, 2006) (arbitration award), the Public Services Commission of Wisconsin held that a LEC could not charge a VoIP provider access charges for terminating VoIP traffic. *Id.* at 32. The Commission went on to hold, however, that such traffic *was* subject to section 251's reciprocal-compensation requirements, and ordered the parties to negotiate an agreement establishing such compensation. *Id.* at 36. Similarly, in *Southwestern Bell Telephone, L.P. v. Missouri Public Service Commission*, 461 F. Supp. 2d 1055 (E.D. Mo. 2006), the district court concluded that although access charges are inapplicable to intraLATA VoIP calls, VoIP carriers are still obligated to pay compensation under section 251 interconnection agreements. *Id.* at 1083. Thus, we reject Global's claim that federal law prohibits the CPUC from enforcing the terms of the Agreement with respect to VoIP traffic.[6]

---

[6]To the extent that Global continues to suggest that its VoIP traffic is entitled to an exemption from its section 251(b)(5) reciprocal-compensation obligation under the FCC's pronouncement in *In re Implementation of the Local Competition Provisions in the Telecommunications Act of 1996* ("*ISP-Remand Order*"), 16 FCC Rcd. 9151 (2001), its argument also fails. The *ISP-Remand Order* addresses the reciprocal-

B

Global next contends that the CPUC's order interpreting the Agreement constitutes an improper exercise of its regulatory authority. According to Global, because the CPUC interpreted a "boilerplate" provision of the Agreement as imposing compensation requirements on VoIP traffic, it effectively "regulated" all VoIP providers that are bound by interconnection agreements containing similar boilerplate clauses. According to Global, interpreting language used in many interconnection agreements is prohibited under our decision in *Pacific Bell v. Pac West Telecomm, Inc.*, 325 F.3d 1114, 1128-29 (9th Cir. 2003). We disagree.

**[9]** The CPUC possesses the authority to resolve disputes between LECs. *See id.* In the course of resolving such disputes, the CPUC may interpret the terms of an interconnection agreement. *See Ill. Bell Tel. Co.*, 551 F.3d at 594-95. Resolving the dispute between Cox and Global necessarily required the CPUC to interpret the terms of the Agreement, and therefore the CPUC acted properly by doing so.

**[10]** Our decision in *Pacific Bell* confirms, rather than contradicts, this conclusion. There, we held that the CPUC could not use its *rulemaking* authority to issue an order purporting to interpret the meaning of terms in interconnection agreements. *Pac. Bell*, 325 F.3d at 1128. This is so because interpreting an interconnection agreement requires the CPUC to consider the terms of the *particular* agreement it is interpreting. Thus, "[t]o suggest that the CPUC could interpret an

---

compensation rate applicable when traffic delivered to an Internet service provider ("ISP") crosses networks owned by more than one LEC. *Id.* at 9187-88. Global does not contend that any of the disputed traffic was sent to an ISP, however. Likewise, the record does not indicate that any of the disputed traffic was delivered to an ISP. Thus, none of the traffic at issue in this case is the type of traffic subject to the *ISP-Remand Order*, and we need not discuss the terms of the *ISP-Remand Order* in further detail.

agreement without reference to the agreement at issue is inconsistent with the CPUC's weighty responsibilities of contract interpretation under § 252." *Id.* at 1128. *Pacific Bell* therefore holds that a state public utility commission may not use its rulemaking authority to engage in activities that are judicial in nature.

**[11]** But the CPUC's conduct in this case is entirely consistent with this limitation. The CPUC did not issue a single order purporting to interpret many agreements; instead, it examined the terms of the Agreement at issue, and reached a conclusion about those terms' meaning. It makes no difference that many interconnection agreements contain language similar to that used in the Agreement. Accordingly, we reject Global's claim to the contrary.

IV

For the foregoing reasons, the judgment of the district court is

**AFFIRMED.**