

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

| | |
|---|---|
| BIG RIVER TELEPHONE COMPANY, LLC, | ) ) ) |
| Appellant, | ) ) |
| v. | ) WD76420 |
| | ) ) OPINION FILED: |
| SOUTHWESTERN BELL TELEPHONE COMPANY, d/b/a AT&T MISSOURI, and MISSOURI PUBLIC SERVICE COMMISSION, | ) June 3, 2014 ) ) ) ) |
| Respondents. | ) ) |

**Appeal from the Public Service Commission**

**Before Division One:** Joseph M. Ellis, Presiding Judge, and
Karen King Mitchell and Anthony Rex Gabbert, Judges

Big River Telephone Company, LLC, appeals from a Report and Order issued by the

Public Service Commission (PSC or the Commission), denying Big River's complaint against

Southwestern Bell Telephone, L.P., d/b/a AT&T Missouri (ATT), and granting ATT's counter-

complaint against Big River. The complaints involved a dispute over access charges billed to

Big River by ATT: Big River claimed that the charges were improperly assessed on non-

chargeable information or enhanced services; ATT claimed that the charges were based on Big

River's provision of interconnected voice over internet protocol (I-VoIP) and were required by both statute and the parties' interconnection agreement (ICA). The PSC determined that the services at issue constituted I-VoIP and were subject to charges. Accordingly, the PSC determined that the amount billed by ATT was due and owing. We affirm.

**Factual and Legal Background**

To understand the nature of this dispute, it is necessary to first understand the legal context in which it arose. Before 1996, local telephone service was generally provided by a single local company whose prices were largely regulated by several governmental agencies. *Global NAPs Cal., Inc. v. Pub. Utils. Comm'n of State of Cal.*, 624 F.3d 1225, 1228 (9th Cir. 2010). The local monopoly, known as a local exchange carrier (LEC) "provided all telephone service in a geographically confined area known as a Local Access and Transport Area [(LATA)]." *Id*. In 1996, Congress passed the Telecommunications Act of 1996 (the Act), which effectively ended the pre-existing system of regulated monopolies. *Id*. "In its place, the Act established a competitive regime under which formerly monopolistic local-service providers, or incumbent local exchange carriers [(ILECs)], and new local-service providers, or competitive local exchange carriers [(CLECs)], compete to provide telephone service in the same LATA." *Id*.

Due to the independent nature of each LEC's telephone lines, customers of one LEC can call customers of a different LEC "only if these networks are interconnected." *Id*. Thus, the Act requires interconnection of the various LEC networks. *Id*. But because consumers do not typically pay to receive phone calls, interconnection can create a loss of compensation to the call recipient's LEC. *Id*. In other words, "[i]f one LEC's customer calls a second LEC's customer, the second customer's LEC will not be compensated for its role in completing the call because it

2

does not bill the caller." *Id*. "To ensure that each LEC is compensated for its role in such calls, the Act requires LECs to negotiate interconnection agreements that 'establish reciprocal compensation arrangements for the transport and termination of telecommunications.'" *Id*. (quoting 47 U.S.C. § 251(b)(5)).

"Under the Act, a service is subject to different regulatory frameworks depending on whether it constitutes an 'information service' or a 'telecommunications service.'" *In re Appropriate Regulatory Treatment for Broadband Access to the Internet Over Wireless Networks*, 22 FCC Rcd. 5901, 5910 (March 23, 2007). "The Act defines 'information service' as the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications . . . ." *Id*. "The Act defines . . . 'telecommunications' as 'the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received.'" *Id*. (quoting 47 U.S.C. § 153(43)).

The dispute in this case arises under the terms of the ICA entered into by Big River (a CLEC) and ATT (an ILEC). Following arbitration, the parties entered into an ICA that was approved by the PSC on August 13, 2005.

The ICA's compensation provisions distinguish between enhanced/information services traffic (which is *not* subject to access charges) and telecommunications traffic (which *is* subject to access charges). The ICA defines enhanced services traffic as "traffic that undergoes a net protocol conversion, as defined by the FCC, between the calling and called parties, and/or traffic that features enhanced services that provide customers a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information." The original ICA classifies voice over Internet protocol (VoIP) traffic as an enhanced service. To aid

3

in billing, the ICA requires the parties to submit to one another reports on their respective Percent Enhanced Usage (PEU) factor.

Big River provides voice telephone services to customers in Missouri, wherein the telephone calls are transmitted in internet-protocol (IP) format, sometimes using IP-enabled customer premises equipment. To facilitate its service, Big River partners with cable companies to provide telephone service in IP format over the cable companies' "last mile" facilities, and in some cases uses DSL (broadband service provided over "last mile" telephone facilities). Big River's service allows its customers to make voice telephone calls to, and receive voice telephone calls from, the public switched telephone network (PSTN). Pursuant to the ICA's PEU provision, beginning on October 25, 2005, Big River reported its PEU to ATT as 100%, meaning that all of its traffic was enhanced, and therefore not subject to access charges.

During the 2008 legislative session, the Missouri Legislature passed (and the governor approved) House Bill 1779, a section of which was later codified at section 392.550[1] and provided in part: "Interconnected voice over Internet protocol service shall be subject to appropriate exchange access charges to the same extent that telecommunications services are subject to such charges." § 392.550.2. It further provided that "[u]ntil January 1, 2010, this subsection shall not alter intercarrier compensation provisions specifically addressing interconnected voice over Internet protocol service contained in an interconnection agreement approved by the commission pursuant to 47 U.S.C. Section 252 and in existence as of August 28, 2008." *Id*. The law also required providers of I-VoIP to register with the PSC and granted the PSC authority "[t]o hear and resolve complaints . . . regarding the payment or nonpayment for exchange access services regardless of whether a user of exchange access service has been

---

[1] All statutory references are to the Missouri Revised Statutes 2000, as updated through the 2013 Cumulative Supplement, unless otherwise noted.

4

certificated or registered by the commission and regardless of whether the commission otherwise has authority over such user." *Id*. at §§ 392.550.1, .4(5).

Despite Big River's representation of a PEU at 100%, ATT billed Big River for access charges, which led to Big River filing suit against ATT in St. Louis County Circuit Court on September 29, 2008, alleging that "AT&T billed Big River $487,779.00 for terminating Enhanced/Information Services traffic sent by Big River to AT&T," that Big River paid the charges, that Big River was entitled to a refund, and that ATT failed to refund the payments. The parties entered into a confidential settlement agreement, which led to an amendment of the parties' ICA.

The parties agreed that the dispute over enhanced services provided prior to January 1, 2010, was to be resolved based on section 13.3 of the current ICA. This would result in Big River not being charged switched access charges for specified enhanced/information services traffic, specifically interconnected VoIP traffic. But, on and after January 1, 2010, the parties' respective obligations were to be governed by the amended ICA.

The ICA was amended "to reflect the Missouri legislation in House Bill 1779 related to the appropriate compensation for voice over internet protocol (VoIP) service effective August 28, 2008." The amendment provided, among others, the following new provision:

> The Parties shall exchange interconnected voice over Internet protocol service traffic, as defined in Section 386.020 RSMo,[2] subject to the appropriate exchange access charges to the same extent that telecommunications services are subject to such charges; provided, however, to the extent that as of August 28, 2008, the Agreement contains intercarrier compensation provisions specifically applicable to interconnected voice over Internet protocol service traffic, those

---

[2] Section 386.020(23) defines "Interconnected voice over Internet protocol service" as a service that:
  (a) Enables real-time, two-way voice communications;
  (b) Requires a broadband connection from the user's location;
  (c) Requires Internet protocol-compatible customer premises equipment; and
  (d) Permits users generally to receive calls that originate on the public switched telephone network and to terminate calls to the public switched telephone network[.]

provisions shall remain in effect through December 31, 2009 and the intercarrier compensation arrangement described in the first clause of this Section shall not become effective until January 1, 2010.

The amendment further provided that it would "act to supersede, amend and modify the applicable provisions contained in the Agreement. To the extent there are any inconsistencies between the provisions of this Amendment and the Agreement, the provisions in this Amendment shall govern."

Beginning February 5, 2010, ATT billed Big River for access charges on billing account number (BAN) 110 401 0113 803. Big River disputed the charges through the informal dispute resolution (IDR) process, outlined in the ICA, by claiming that its PEU continued to be 100%, and thus it was not subject to access charges. The parties were unable to resolve the dispute through the IDR process, and ATT advised Big River that if it continued in its refusal to pay the charges, ATT would no longer honor Big River's requests for additional service and would suspend provisioning activity on all pending orders. Big River filed a complaint before the PSC on March 1, 2012, seeking a determination that all of its services constituted enhanced services under the ICA and were, therefore, not subject to access charges. ATT filed a counter-complaint, seeking a determination that Big River's traffic constituted I-VoIP and was subject to access charges—specifically, the amount billed by ATT on BAN 110 401 0113 803.

Both parties, along with the Staff of the PSC (Staff), filed a Joint Stipulation of Non-Disputed Material Facts. The stipulation indicated the following information applicable as of January 1, 2010:

(1) The traffic Big River delivered to ATT "over the interconnection trunks established [under] the parties' ICA was Voice over Internet Protocol ('VoIP') traffic."

6

(2) The same traffic "originated with Big River telephone service customers using IP-enabled customer premises equipment."

(3) Big River's telephone service "allowed Big River's customers to make voice telephone calls to, and receive voice telephone calls from, the public switched telephone network (PSTN)," specifically with customers of ATT.

(4) Big River's telephone service allowed its customers "to engage in real-time, two-way voice communications with customers served via the PSTN."

(5) "Big River submitted a sworn application to the Minnesota commission explaining that to provide telephone service, '[c]ustomers will be accessed through the broadband connections of local Cable TV operators,' and Big River provides service in other states in the same manner."

The parties and Staff agreed that there were two issues before the PSC for determination: (1) "Should the traffic which Big River has delivered to AT&T Missouri over the local interconnecting trunks for termination, and for which AT&T Missouri has billed Big River access charges since January, 2010 under Billing Account Number 110 401 0113 803 ('BAN 803'), be classified as interconnected VoIP traffic, enhanced services traffic, or neither?"; and (2) "What charges, if any, should apply to the traffic referenced in Issue No. 1?"

Big River argued that, while its service constituted VoIP traffic (which is an enhanced service), it did not constitute I-VoIP as statutorily defined because the service did not "require" a broadband connection. In making this argument, Big River suggested that broadband was defined as an internet service, faster than dial-up, that provides minimum speeds of 200 kbps (kilobits per second). Big River further argued that, because Big River customers could still make voice calls at speeds as low as 40 kbps—which it suggested was lower than the average

7

dial-up speed of 56 kbps—broadband was not *required*; thus, the service did not meet the statutory definition of I-VoIP.[3] Big River further argued that its service was enhanced due to a variety of different features and functions available to Big River telephone customers. Thus, Big River suggested that no access charges were appropriate.

ATT argued that the service Big River provided constituted I-VoIP, which was subject to access charges (specifically $350,637.60 as of August 2012) under the ICA, as amended, and rendered the question of enhanced services moot. ATT alternatively argued that the features Big River identified did not transform what otherwise would be telecommunications services into enhanced services.

Staff argued that Big River provided I-VoIP and suggested, accordingly, that the PSC need not determine whether the services were enhanced. Staff also recommended that the PSC order ATT to provide further call records to allow Big River to verify the accuracy of the charges billed.

The PSC issued its Report and Order, finding that Big River's service constituted I-VoIP and was, therefore, subject to the access charges billed by ATT in BAN 110 401 0113 803, which it determined—based upon ATT Exhibit 33—to be $352,123.48. The PSC declined to address the question of whether the services were enhanced. Big River appeals.

## Standard of Review

When reviewing a challenge to a decision of the PSC, "[t]he Commission's decision is presumed valid, and the party attacking it has the burden of proving its invalidity." *State ex rel. GS Techs. Operating Co., Inc. v. Pub. Serv. Comm'n of State of Mo.*, 116 S.W.3d 680, 687 (Mo. App. W.D. 2003).

---

[3] Big River supported this assertion with a demonstration of a voice call made over its network with a capped speed of 40 kbps.

Our review employs a two-part test: first, we determine if the Commission's order was lawful; and then, we determine if the order was reasonable. *Id*. "An order is lawful if there is statutory authority for its issuance." *Id*. To make this determination, "'an appellate court must exercise unrestricted, independent judgment and correct erroneous interpretations of the law.'" *Id*. (quoting *State ex rel. Alma Tel. Co. v. Pub. Serv. Comm'n*, 40 S.W.3d 381, 388 (Mo. App. W.D. 2001)). An order is reasonable if it: (1) is supported by competent and substantial evidence upon the whole record; (2) is not arbitrary or capricious; and (3) does not constitute an abuse of the PSC's discretion. *Id*. "This court will not substitute its judgment for that of the Commission," and we will not disturb the Commission's order unless "it was 'clearly contrary to the overwhelming weight of the evidence.'" *Id*. (quoting *Alma Tel. Co.*, 40 S.W.3d at 388).

### Analysis

Big River raises four points on appeal. In its first point, Big River argues that the PSC's determination that Big River owed ATT $352,123.48 was unlawful in that the PSC has no jurisdiction under its statutorily granted authority to award monetary damages. In its second point, Big River argues that the PSC's determination that Big River owed ATT $352,123.48 was unreasonable because the finding was not supported by competent and substantial evidence on the whole record in that the evidence the Commission relied upon was inadmissible. In its third point, Big River claims that the PSC's determination that Big River's traffic was I-VoIP was unreasonable because the Commission relied upon an improper definition of broadband and ignored credible evidence supporting Big River. And in its fourth point, Big River argues that the PSC's order finding that Big River's traffic was subject to access charges was unreasonable because it was against the substantial weight of the evidence in that Big River's traffic met the definition of an enhanced service.

9

**A.  The PSC's determination that Big River owed ATT $352,123.48 was lawful and did not constitute an award of monetary damages.**

Big River argues that the PSC is a creature of statute, and as such, has only that jurisdiction granted to it by law.  Because there is no statute authorizing the PSC to award monetary damages, Big River claims that the Commission's determination of the amount owed to ATT by Big River was unlawful.  ATT counters that the PSC's order did not contain any damage award but instead was merely a lawful exercise of the Commission's authority to interpret and enforce the ICA.  Staff argues that this claim is not reviewable due to Big River's failure to include it in Big River's application for rehearing, but is nevertheless without merit insofar as the Commission's determination was a lawful exercise of its authority to interpret and enforce the ICA.  We first address Staff's argument that Big River's first point is not reviewable.

"After an order or decision has been made by the commission, . . . any corporation . . . interested therein shall have the right to apply for a rehearing in respect to any matter determined therein."  § 386.500.1.  "No cause or action arising out of any order or decision of the commission shall accrue in any court to any corporation . . . unless that party shall have made, before the effective date of such order or decision, application to the commission for a rehearing."  § 386.500.2.  "Such application shall set forth specifically the ground or grounds on which the applicant considers said order or decision to be unlawful, unjust or unreasonable."  *Id*. "The applicant [in a motion for rehearing] shall not in any court urge or rely on any ground not so set forth in its application for rehearing."  *Id*.

Here, Big River timely filed an application for rehearing, but concedes that it did not include the claim raised in Point I in its application.  Big River argues, however, that because its claim involves the subject matter jurisdiction of the PSC, it was not required to raise this claim in the application for rehearing in order to obtain review on appeal.

"The Commission's authority is limited to that specifically granted by statute or warranted by clear implication as necessary to effectively render a specifically granted power." *State ex rel. Int'l Telecharge, Inc. v. Mo. Pub. Serv. Comm'n*, 806 S.W.2d 680, 686 (Mo. App. W.D. 1991). Thus, there is but one narrow exception to the mandate of section 386.500.2, and that is a claim that the Commission exceeded its subject matter jurisdiction. *Id*. at 687. Given that Big River has alleged that the Commission acted outside of its jurisdiction, we will review the claim.

While we agree with Big River that the Commission lacks authority to award monetary damages, *see State ex rel. GS Techs. Operating Co., Inc.*, 116 S.W.3d at 696, we disagree with Big River that the Commission's determination of the amount due constituted an award of damages. To begin, ATT never sought damages in its counter-complaint; rather, it merely sought enforcement of the contractual terms of the ICA. And though there is case law supporting the notion that the Commission typically lacks jurisdiction to enforce, construe, or annul contracts, *id*., that is simply not true in the context of ICAs established pursuant to the Telecommunications Act.

"The Act provides that an interconnection agreement, reached either by negotiation or arbitration, must be submitted to the state commission for approval." *Sw. Bell Tel. Co. v. Connect Commcn's Corp.*, 225 F.3d 942, 946 (8th Cir. 2000). "This grant of power to state commissions necessarily includes the power to enforce the interconnection agreement." *Id*.; *see also In re Starpower Commcn's, LLC*, 15 F.C.C.R. 11277, 11279 (2000) (finding that "inherent in state commissions' express authority to mediate, arbitrate, and approve interconnection agreements under section 252 is the authority to interpret and enforce previously approved agreements"). In fact, section 392.550.4(5) specifically provides:

Notwithstanding any other provision of law to the contrary, the public service commission shall have the following authority with respect to providers of interconnected voice over Internet protocol service and their provision of such service: . . . [t]o hear and resolve complaints under sections 386.390 and 386.400 regarding the payment or nonpayment for exchange access services regardless of whether a user of exchange access service has been certificated or registered by the commission and regardless of whether the commission otherwise has authority over such user.

And in its complaint, Big River recognized the Commission's jurisdiction, as evidenced by its allegation that "[t]he Commission . . . has jurisdiction to address this complaint regarding the terms and conditions of an interconnection agreement pursuant to the Act."

In short, because the Commission's determination of the amount due was simply an exercise of its lawful authority granted under both federal and state law to interpret and enforce the ICA, it did not exceed its jurisdiction.

Point I is denied.

**B. The PSC's determination that Big River owed ATT $352,123.48 was supported by competent and substantial evidence.**

In its second point on appeal, Big River argues that the Commission's finding regarding the amount due to ATT was unreasonable in that it was not supported by competent and substantial evidence. Specifically, Big River argues that the only evidence supporting the Commission's determination was inadmissible.

In determining that Big River owed $352,123.48 in access charges, the Commission relied upon ATT's Exhibit 33, a spreadsheet prepared by witness William Greenlaw, which showed that the amounts billed by ATT on BAN 110 401 0113 803 from February 2010 through December 2012 totaled $352,123.48. In relying on this exhibit, the Commission specifically noted that "[a]t no time during the IDR process . . . did Big River dispute the accuracy of AT&T Missouri's calculation of the access charges billed to Big River."

Big River filed a motion to strike Greenlaw's testimony on the bases that he could not serve as a fact witness because he did not work in ATT's billing department and that he was not qualified to be an expert witness because he had no experience with billing.[4] Big River's argument, however, misses the mark.

"'The PSC's authority and the procedures it follows are set out principally in chapter 386.'" *In re KCP&L Greater Mo. Operations Co.*, 408 S.W.3d 175, 183 (Mo. App. W.D. 2013) (quoting *State ex rel. Praxair, Inc. v. Mo. Pub. Serv. Comm'n*, 344 S.W.3d 178, 184 (Mo. banc 2011)). Section 386.410.1 provides: "All hearings before the commission . . . shall be governed by rules to be adopted and prescribed by the commission. And in all . . . hearings[,] the commission . . . shall not be bound by the technical rules of evidence." "Additionally, '[t]o the extent that there are matters not addressed by the PSC statutes and administrative rules adopted by the PSC . . . , MAPA [the Missouri Administrative Procedure Act] "operates to fill gaps not addressed within the PSC statutes."'" *In re KCP&L*, 408 S.W.3d at 183 (quoting *Praxair*, 344 S.W.3d at 184).

Section 536.070(11) of MAPA directly addresses the admissibility of spreadsheets like ATT's Exhibit 33:

> In any contested case: . . . [t]he results of . . . compilations of figures, . . . involving interviews with many persons, or examination of many records, or of long or complicated accounts, or of a large number of figures, or involving the ascertainment of many related facts, shall be admissible as evidence of such results, if it shall appear that such . . . compilation of figures . . . was made by or under the supervision of a witness, who is present at the hearing, who testifies to the accuracy of such results, and who is subject to cross-examination, and if it shall further appear by evidence adduced that the witness making or under whose supervision such . . . compilation of figures . . . was made was basically qualified to make it.

---

[4] In response to Big River's motion for summary determination on the amount billed, ATT submitted an affidavit from Claude Rich, the Associate Director of Billing Operations within ATT's Finance Billing Operations department, that claimed that Big River owed approximately $352,806.75 under BAN 110 401 0113 803 as of December 5, 2012. For reasons unknown, ATT did not offer this affidavit at the hearing.

The statute further provides that, once the foundation is laid, "[a]ll the circumstances relating to the making of such [a] . . . compilation of figures . . . , including the nature and extent of the qualifications of the maker, may be shown to affect the weight of such evidence but such showing shall not affect its admissibility." *Id.*

Exhibit 33 was a compilation of figures billed by ATT to Big River for the traffic at issue in the dispute and created either by Greenlaw or under his authority. Greenlaw acknowledged that he had consulted with many people to compile the figures of Exhibit 33 and had reviewed Big River's testimony, public documents, documents filed with the Commission, and the ICA. Greenlaw was obviously present at the hearing and available for cross-examination.[5]

The evidence also indicates that Greenlaw was "basically qualified" to present this evidence. Greenlaw indicated that he had specialized knowledge that would assist the Commission in understanding the facts of the case. And Greenlaw had significant experience and training, working for ATT, including sales and product pricing.[6] Though Greenlaw did not testify to the accuracy of the results, as is required by the statute, accuracy was not at issue in the hearing due to Big River's failure to raise it at any time during the IDR process—a fact that the PSC specifically noted in its Report and Order. Given Greenlaw's position and experience with

---

[5] Big River opted not to cross-examine Greenlaw, however, asserting that he had no competent evidence to offer.

[6] Greenlaw testified that he was the area manager for wholesale regulatory policy and support and that he worked on behalf of ATT's ILECs throughout ATT's 22-state ILEC territory. Greenlaw indicated that he was responsible for providing regulatory and witnessing support relative to various wholesale products and their pricing; supporting negotiations of local ICAs; participating in state commission and judicial proceedings; and assisting in helping to ensure continuing compliance with the Act and its implementing rules. Greenlaw testified that he held a Bachelor of Business Administration degree in Marketing and that he had worked for ATT for the past 19 years. For the immediately preceding 15 years, Greenlaw worked in wholesale organizations that support and interact with CLECs (like Big River). Before that, Greenlaw held management positions responsible for CLEC customer care, CLEC sales and sales support, local switched product management, local switched policy management, and segment marketing.

ATT, he was "basically qualified" to testify regarding the amount billed. Thus, Exhibit 33 was admissible.

Big River's complaints about Greenlaw's qualifications go only to "the weight of such evidence" and "shall not affect its admissibility." § 536.070(11). And "even if it would have been preferable [for] the witness [to have] more experience," so long as the witness "had sufficient knowledge and experience so that his testimony would be of assistance to the PSC in reaching its determination," the testimony will be deemed properly admitted. *State ex rel. Midwest Gas Users' Ass'n v. Pub. Serv. Comm'n of State of Mo.*, 976 S.W.2d 485, 495 (Mo. App. W.D. 1998). Because Exhibit 33 was admissible, the Commission's determination of the amount due was supported by competent and substantial evidence. Thus, it was reasonable.

Point II is denied.

## C. The PSC's determination that Big River's traffic constituted I-VoIP was reasonable.

In its third point, Big River argues that the Commission's determination that Big River's traffic constituted I-VoIP was unreasonable. More specifically, Big River suggests that the Commission improperly defined "broadband" and, by employing the improper definition, the Commission erroneously concluded that Big River's traffic required a broadband connection and, therefore, met the statutory definition of I-VoIP.[7]

Both ATT and Staff argue that the Commission's determination that broadband was anything other than dial-up or narrowband connections was reasonable, and the fact that Big River's customers could still receive service at speeds slower than traditional dial-up did not

---

[7] The parties disagree as to who bore the burden of proof on this point. Big River argues that, because ATT pled that Big River's traffic was I-VoIP, ATT bore the burden of proving that the traffic constituted I-VoIP. ATT counters that, because Big River pled that its traffic was exempt from access charges and because the nature of the traffic is a matter exclusively within Big River's knowledge, Big River bore the burden of disproving that its traffic constituted I-VoIP. We note that the PSC found this to be ATT's burden, but we need not decide the issue because there was sufficient competent and substantial evidence in the record, presented by both parties, to support the PSC's determination.

15

convert the service to narrowband. They further argue that, because Big River does not offer services to customers over dial-up or narrowband connections, broadband is "required" for Big River's service, and thus the statutory definition of I-VoIP is satisfied.

I-VoIP service is defined in section 386.020(23) by the presence of four factors. It is a service that:

(a) Enables real-time, two-way voice communications;

(b) Requires a broadband connection from the user's location;

(c) Requires Internet protocol-compatible customer premises equipment; and

(d) Permits users generally to receive calls that originate on the public switched telephone network and to terminate calls to the public switched telephone network[.]

Big River conceded that factors (a), (c), and (d) were present, but contested the existence of factor (b).

Before addressing Big River's complaint, it is worth mentioning that Big River conceded at various points that it provided VoIP, but denied providing I-VoIP. This argument is somewhat perplexing, as the only distinction between VoIP and I-VoIP is the presence of interconnection.[8] Clearly, Big River's service was interconnected: the subject of the dispute arises from the terms of an *Interconnection* Agreement, and Big River concedes that its traffic is interconnected. Consequently, if Big River was providing VoIP, it was necessarily providing I-VoIP to its customers that interacted with customers of ATT. Additionally, Big River has acknowledged that the service it had been providing constituted I-VoIP and that it would be treated as I-VoIP and subject to access charges beginning January 1, 2010. Furthermore, Big River represented its

---

[8] The FCC has defined VoIP as "a technology that allows [a user] to make voice calls using a broadband Internet connection instead of a regular (or analog) phone line." http://www.fcc.gov/encyclopedia/voice-over-internet-protocol-voip (last accessed May 5, 2014). The FCC defines I-VoIP as "VoIP services that allow users generally to make calls to and receive calls from the regular telephone network." http://www.fcc.gov/guides/voice-over-internet-protocol-voip (last accessed May 5, 2014).

16

service to other states and to the FCC as I-VoIP, and it indicated that those services were provided in the same manner in all states in which it operates. Big River's prior concessions make it difficult for us to label the Commission's determination unreasonable.

The parties all agreed that broadband is generally defined as a connection speed faster than dial-up (though they disagree as to the identification of these various speeds). The crux of Big River's argument is that, because Big River's customers can still make calls at speeds slower than traditional dial-up speeds, broadband is *not* "required." In other words, Big River argues that, if it is technologically possible for voice services to be provided in IP-format at a speed equal to or slower than dial-up, those services cannot constitute VoIP or I-VoIP.

In the Report and Order, however, the Commission found that, because Big River does not provide service over dial-up connections and because its service is "designed for and marketed to customers that use a broadband connection," a broadband connection *is* "required." We find this determination to be reasonable.

The Commission specifically found that "Big River's service connections should . . . be considered to be broadband regardless of the specific speed of the connection because they are faster than analog dial-up service." The Commission relied upon the following language from a United States Supreme Court decision:

> Dial-up connections are . . . known as 'narrowband,' or slower speed, connections. 'Broadband' Internet service, by contrast, transmits data at much higher speeds. There are two principal kinds of broadband Internet service: cable modem service and Digital Subscriber Line (DSL) service.

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Serv.*, 545 U.S. 967, 975 (2005). The Commission noted that "[t]he parties have stipulated that Big River partners with cable and DSL providers to provide telephone service in IP format over those companies' 'last mile' facilities, which are broadband connections." In fact, the voice call that Big River demonstrated at the

17

lowered speed was made over a DSL connection and identified by Big River as a VoIP call. And Big River conceded that DSL technology was intended to offer customers speeds faster than dial-up.

"Required" in this context need not mean "indispensable or necessary"; it can also mean "useful or appropriate." *See, e.g., Nat'l R.R. Passenger Corp. v. Boston and Me. Corp.*, 503 U.S. 407, 418 (1992). Although the FCC has recognized "that some kinds of VoIP service can be supported over a dialup connection," the FCC indicated its expectation "that most VoIP services will be used over a broadband connection." *In re IP-Enabled Servs.*, 20 FCC Rcd. 10245, 10282 n.76 (June 3, 2005). Thus, it appears that the FCC defines "required" for purposes of defining I-VoIP, as "useful or appropriate," rather than "indispensable or necessary." In any event, Big River's customers are required to use broadband connections solely due to the fact that Big River does not offer dial-up or analog service to its customers; thus, it was reasonable for the Commission to determine that, in order to use Big River's voice communication services, broadband is "required."

Big River also takes issue with the manner in which the Commission defined broadband. In the Report and Order, the Commission noted that dial-up service "connects at 14.4 kilobits per second." Big River contends that the Commission's finding that dial-up service connects at 14.4 kbps was unreasonable because the standard dial-up connection speed is 56 kbps; thus, the fact that Big River customers can make calls at a capped speed of 40 kbps indicates that broadband is not required. Though we recognize that broadband may not be technologically necessary in order to place VoIP calls, generally, broadband connections are necessary for Big River customers, given their lack of alternative connection options. Accordingly, we need not decide—and it is not within this Court's province to determine—whether broadband or

18

narrowband can be defined by any given speed because Big River simply does not offer narrowband or analog connections to its customers. Because it offers only broadband connections, regardless of speed capability,[9] broadband is "required."

In light of the foregoing, we find that the Commission's determination that Big River provided I-VoIP traffic was reasonable.

Point III is denied.

**D. The PSC did not need to address whether Big River's traffic constituted enhanced services.**

In its final point, Big River argues that the Commission erred in not addressing whether its traffic constituted enhanced services under the ICA. Big River suggests that, even if its traffic were properly characterized as I-VoIP, the Commission was still required to determine if it also constituted enhanced services. ATT agrees that I-VoIP traffic meets the definition of an enhanced service but argues that the determination is irrelevant in light of section 392.550.2's mandate that I-VoIP service "shall be subject to appropriate exchange access charges to the same extent that telecommunications services are subject to such charges." Thus, ATT argues, the Commission did not err in declining to address the issue. Staff also asserts that a determination as to whether Big River's traffic was enhanced was unnecessary in light of the Commission's determination that the traffic constituted I-VoIP. Staff further argues that, because the

---

[9] Big River repeatedly argued to the Commission and in its brief before this Court that "broadband" means a minimum speed of 200 kbps. In making this argument, Big River relied on a variety of FCC rulings regarding the meaning and definition of broadband. Though we need not decide what, if any, implications there are for the definition of I-VoIP based upon the FCC benchmark for broadband speeds, we note that the rulings Big River relies upon do not set 200 kbps as a *minimum*. Rather, the rulings define broadband as "services with over 200 kbps *capability* in at least one direction" and "infrastructure *capable* of delivering a speed in excess of 200 kbps in at least one direction." *See In re Appropriate Regulatory Treatment for Broadband Access to the Internet Over Wireless Networks*, 22 FCC Rcd. 5901, 5925 n.55, 58 (March 23, 2007) (emphasis added). The rulings suggest a capability, not a minimum. And in any event, the FCC has expressly stated that the broadband speed thresholds identified in their Broadband Deployment Reports are "not intend[ed] . . . to have any other regulatory significance under the Commission's rules . . . . For example, [the] report[s] ha[ve] no impact on which entities are classified as interconnected VoIP providers." *Sixth Broadband Deployment Report*, 25 FCC Rcd. 9556, 9575, n.46 (July 20, 2010) (citing 47 C.F.R. § 9.3, "defining interconnected VoIP service in relevant part as a service that '[r]equires a broadband connection from the user's location'").

19

Commission did not make such a determination, we are not at liberty to do so either. Staff suggests that, at most, if we find the Commission's failure to address the issue erroneous, we are limited to remanding for the Commission to make the determination.

Under both section 392.550.2 and the terms of the ICA, I-VoIP traffic is subject to exchange access charges. Big River's argument that the Commission failed to ask the follow-up question of whether the traffic was also enhanced is misplaced in light of both the law and the terms of the ICA amendment. Big River's argument is essentially that the second half of section 392.550.2—the phrase, "to the same extent that telecommunications services are subject to such charges"—implies that, if I-VoIP traffic meets the definition of enhanced services, it would then not be subject to exchange access charges.

"[The] Act's definitions of 'telecommunications service' and 'information [or enhanced] service'[10] [are] mutually exclusive." *In Re Commc'ns Assistance For Law Enforcement Act and Broadband Access and Servs.*, 20 F.C.C.R. 14989, 14996 (September 23, 2005). Accepting Big River's interpretation of the statute would blur the lines between these categories to mean that some services could simultaneously be both telecommunications and enhanced services. While I-VoIP may have characteristics of both—an issue we leave to the FCC and the PSC to determine[11]—the statute plainly provides that it is to be treated as a telecommunications service, regardless of its characteristics. Furthermore, Big River's position (which is undisputed by ATT), that all I-VoIP constitutes an enhanced service, renders section 392.550.2 meaningless because, as an enhanced service, I-VoIP could *never* be subject to access charges. "'When

---

[10] It appears that "information services" are synonymous with "enhanced services."

[11] *See State ex rel. GTE North, Inc. v. Mo. Pub. Serv. Comm'n*, 835 S.W.2d 356, 362 (Mo. App. W.D. 1992) (holding that a reviewing court's authority is limited to either affirming the Commission's decision or setting it aside as unlawful or unreasonable; a reviewing court may not direct the Commission what order to make). Thus, even if we were to agree with Big River that the Commission needed to decide whether its traffic constituted enhanced services, we would be limited to remanding for that purpose; we are not at liberty to determine the issue ourselves.

interpreting statutes, courts do not presume that the legislature has enacted a meaningless provision.'" *State ex rel. Nothum v. Walsh*, 380 S.W.3d 557, 576 (Mo. banc 2012) (quoting *Edwards v. Gerstein*, 237 S.W.3d 580, 581 (Mo. banc 2007)).

Although the language of the original ICA did not distinguish between enhanced services and VoIP, leaving VoIP exempt from access charges, the amendment provided that it was to "supersede, amend and modify the applicable provisions contained in the Agreement." And, "[t]o the extent there are any inconsistencies between the provisions of th[e] Amendment and the Agreement, the provisions in th[e] Amendment shall govern." The amendment mandates that I-VoIP traffic be treated as a telecommunications service and therefore subject to access charges. Simply put, under the language of both the ICA amendment and section 392.550.2, if traffic constitutes I-VoIP, it is subject to access charges, the same way that telecommunications services are, regardless of whether the I-VoIP traffic also meets the definition of an enhanced service.

In light of our determination under Point III—that the Commission's determination that Big River's traffic constituted I-VoIP was reasonable—we cannot say that the Commission's decision not to address whether the traffic also met the definition of an enhanced service was unreasonable.

Point IV is denied.

### Conclusion

Because the Commission's Report and Order was neither unlawful nor unreasonable, its decision is affirmed.

Karen King Mitchell, Judge

Joseph M. Ellis, Presiding Judge, and
Anthony Rex Gabbert, Judge, concur.

21